HOPPE, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–180–CR.   Argued September 14, 1976.—*
*Decided October 19, 1976.*
(Also reported in 246 N. W. 2d 122.)

108

For the plaintiff in error there was a brief by *Howard B. Eisenberg,* state public defender, and *Ronald L. Brandt,* deputy state public defender, and oral argument by *Mr. Brandt.*

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HEFFERNAN, J.   The defendant, Thomas F. Hoppe, was found guilty of murder in the second degree of Lynn Westbrook and the attempted first-degree murder of Mary Jans. Hoppe was sentenced to ten years for the attempted first-degree murder and twenty years for the second-degree murder, with the terms to be served consecutively.

On this appeal Hoppe contends that he was deprived of his constitutional right to a fair trial, because the trial judge improperly denied his motion for change of venue because of community prejudice, that there was insufficient credible evidence to support the convictions, that prosecutorial misconduct by the district attorney during the course of trial denied him due process, and that, because of cumulative errors, he should be granted a new trial in the interest of justice. In respect to each of these contentions we conclude that they are without merit and affirm the judgment.

The factors which this court is obliged to consider in determining whether a change of venue ought to have been granted because of community prejudice are outlined in *McKissick v. State* (1971), 49 Wis. 2d 537, 545, 546, 182 N.W. 2d 282:

"The inflammatory nature of the publicity; the degree to which the adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity; the degree of care exercised, and the amount of difficulty encountered, in selecting the jury; the extent to which the jurors were familiar with the publicity; and the defendant's utilization of the challenges, both peremptory and for cause, available to him on *voir dire*. In addition, the courts have also considered the participation of the state in the adverse publicity as relevant, as well as the severity of the offense charged and the nature of the verdict returned."

Where evidence is presented by the parties in respect to the factors outlined in *McKissick,* a trial judge is obliged to grant a change of venue if there is a reasonable likelihood that the defendant will not receive a fair trial. The question of change of venue is addressed to the trial judge's discretion, and any doubts in the mind of the trial judge should be resolved in favor of the defendant's motion. *State v. Herrington* (1969), 41 Wis. 2d 757, 763, 165 N.W. 2d 120. The trial judge's exercise of discretion in the denial of such motion will, therefore, not be set aside in the absence of an abuse of discretion. Deference must be paid by this court to the trial judge's determination, although we are obliged to review the evidence *ab initio* in determining whether the trial judge's discretion was appropriately exercised. This court said in *State ex rel. Hussong v. Froelich* (1974), 62 Wis. 2d 577, 591, 215 N.W. 2d 390:

" 'The difficulty of impressing upon the record a true concept of the public sentiment in the county is manifest. Just as the trial judge is in a better position to weigh the

testimony of witnesses who appear before him, so is he in a better position to judge of the public sentiment of the county. He is on the ground and in a position to sense, in a way that this court cannot, the true sentiment of the community and to judge much more correctly whether it is such as to prevent a fair trial on the part of the defendants.' "

In analyzing whether the trial judge properly exercised his discretion, it is necessary for this court to determine whether there was a reasonable likelihood of community prejudice prior to, and at the time of, trial and whether the procedures for drawing the jury evidenced any prejudice on the part of the prospective or impaneled jurors.

In respect to community prejudice, we are concerned with the nature of publicity, the degree to which the publicity permeated the community, the timing and specificity of the coverage in relationship to the time of trial, the degree of state participation in the dissemination of the publicity, and the publication of information that was not admissible at trial.

In respect to the jurors called and impaneled at trial, this court must address itself to the care used by the court in selecting the jury, the difficulty with which the jury was selected, the familiarity of prospective and impaneled jurors with the case, the use made of challenges to jurors, and the nature of the verdict rendered.

The record shows that the two victims of the crimes charged here were students at the University of Wisconsin-Oshkosh, that the defendant Hoppe and Roy Holland secured entrance to the students' apartment by a ruse, that one or both thereafter forced the women to have sexual relations with them, and that subsequently one of the women, Lynn Westbrook, died as a result of strangulation and the other, Mary Jans, was the victim of a strangulation attack, from which she managed to escape.

It is apparent that crimes of this nature would make a substantial impact upon the community and would be

the subject of extensive media coverage. The facts adduced at the motion for a change of venue bear this out.

The crimes occurred on the evening of January 9, 1974. Between January 11 and January 25, 1974, the two leading newspapers in the area, the *Oshkosh Daily Northwestern* and the *Appleton Post Crescent*, published 24 news articles in connection with these crimes. These two newspapers were distributed, respectively, to 59 percent and 39 percent of all households in the area. It is apparent that the likelihood that the community and the prospective jurors would be informed about the general nature of the crimes and some of its specifics was very high. However, it has been repeatedly held that an informed jury is not necessarily to be equated with a partial or biased jury and that mere familiarity with specific facts will not, in itself, disqualify jurors. *Irvin v. Dowd* (1961), 366 U.S. 717, 81 Sup. Ct. 1639, 6 L. Ed. 2d 751; *Tucker v. State* (1973), 56 Wis. 2d 728, 202 N.W. 2d 897.[1]

Where the reporting is objective, informational, and noneditorial, it is not to be considered prejudicial. *State v. White* (1975), 68 Wis. 2d 628, 229 N.W. 2d 676; *Jones v. State* (1974), 66 Wis. 2d 105, 223 N.W. 2d 889; *Hussong, supra,* p. 594.

The record fails to reveal any evidence of biased or inflammatory television or radio coverage. The predominant tone of the coverage in both newspapers is objective and informational.

An article of the *Oshkosh Daily Northwestern* did, however, state that both of the individuals arrested for

---

[1] Sec. 270.17, Stats.:

"270.17 Newspaper information does not disqualify. It shall be no cause of challenge to a juror that he may have obtained information of the matters at issue through newspapers or public journals, if he shall have received no bias or prejudice thereby; or that he is an inhabitant of or liable to pay taxes in a county interested in the action."

the crimes had prior criminal records of burglary and escape. The same paper carried a report of the security measures utilized in the courtroom during the preliminary proceedings because of the possibility of trouble and the "sensitivity of the case." A police officer was reported as stating that, in view of the nature of the crimes, people might be tempted to shoot the defendants.

The *Appleton Post Crescent* on January 11, 1974, reported Mary Jans' statement to the police and, in a later article, stated that Jans described Lynn Westbrook's screams at or about the time of the fatal assault as "the most God-awful scream of my life." Perhaps the least objective material that appeared in any of the papers was the *Appleton Post Crescent's* report of the statement of the dean of students of the University of Wisconsin-Oshkosh in which he said that the student population was mollified by the prompt arrest of the two suspects. He was quoted as saying:

" 'They [the police] don't make many mistakes. I have a lot of respect for them. They're very professional.' "

He described the students' reaction to the crimes as:

" 'The kind of anger where you say, "if I could get my hands on the men who did it, I'd wring their necks." There's the same sort of feeling in the community . . . .' "

As stated above, the defendant did have a record of prior unrelated crimes, which were reported in the press. However, as we stated in *State v. Nutley* (1964), 24 Wis. 2d 527, 129 N.W. 2d 155, such information in regard to unrelated prior convictions does not create such prejudice as to compel a new trial because of inflammatory and prejudicial publicity.

It is apparent that the news articles were not favorable to the defendants, but they do not rise to the inflammatory level that evidences the inability to afford a

fair trial in the community. The articles were informational and uneditorialized. They were not of such magnitude as to compel the trial judge to conclude that an impartial jury could not be impaneled. Inflammatory and prejudicial coverage by the news media which would make it impossible to afford a fair trial is exemplified in *Rideau v. Louisiana* (1963), 373 U.S. 723, 83 Sup. Ct. 1417, 10 L. Ed. 2d 663. In that case the accused's confession was televised to 105,000 of the 150,000 homes in the area from which the jury was to be drawn. Another example of widespread prejudicial publicity is afforded by *Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 Sup. Ct. 1507, 16 L. Ed. 2d 600. Thousands of articles, cartoons, and editorials were published urging the conviction of Sheppard, implying that he had confessed to the murder of his wife and detailing his extramarital affairs.

We are satisfied that the trial judge did not abuse his discretion in respect to finding that the pretrial publicity was not so prejudicial as to make unlikely a fair trial. By and large, the media coverage was informational and accurate.

It is also important to note that, although the coverage was hardly favorable to the defendants, most of the articles were published in the fourteen days immediately following the crimes. Almost four months elapsed before the defendants were brought to trial in May of 1974. During that period there was no evidence of any publicity arguably prejudicial to the defendants, and we have held that, even where community prejudice is found to exist initially, a delay or cooling-off period contributes to the ability of the state to conduct a fair trial.

We held in *Jones v. State, supra,* that a four-month period was sufficient to ameliorate the effect of initial prejudice, and a like period was held sufficient in *McKissick, supra.* In *Schenk v. State* (1971), 51 Wis. 2d 600, 187 N.W. 2d 853, a lapse of three months was curative of the initial prejudice.

While we cannot conclude that the lapse of time in the instant case would in itself have been curative of a high degree of inflammatory and prejudicial publicity, such publicity is not revealed by the record here.

The record of the questioning of the panel at the time of the *voir dire* shows that impartial jurors were selected, and the defendant was protected by careful *voir dire* procedure, including the appropriate use of challenges by counsel. Although the ease or difficulty in selecting a jury is not dispositive of whether a fair jury has been impaneled, it is a factor to be considered. *Jones v. State, supra; Miller v. State* (1967), 35 Wis. 2d 777, 15 N.W. 2d 688. The record here shows that the jury which tried the case was selected on a single day. Fifty-two prospective jurors were questioned by the court and counsel before the jury was drawn. Twenty-three were stricken by the court for cause, 18 of whom indicated that they had formed an opinion in respect to guilt or innocence. Sixteen jurors were stricken as a result of challenges by counsel. Prospective jurors who expressed an opinion in respect to guilt were dismissed from the panel. The proceeding was carefully conducted by the court, and all jurors were questioned individually out of the presence of other jurors. Although almost every one of the jurors selected had heard something of the case, few of them remembered any of the details and most acknowledged that they had heard so little of the case for such a long time that they had no detailed recollection of the alleged crimes. The 12 jurors and the alternates eventually selected, on the record, indicated that they were free from opinion, bias, or prejudice.

The defendant Hoppe was charged with first-degree murder, but the jury convicted him of the lesser offense, second-degree murder. As we stated in *Tucker v. State, supra,* the fact that the jury did not convict on the original charge is evidence that the jury, in fact, acted with impartiality in the course of the trial.

We conclude that the trial judge did not abuse his discretion in determining that community prejudice was not so inflammatory as to prevent the reasonable likelihood of a fair trial, and that the court and counsel, by the appropriate use of the *voir dire* procedures, did in fact assure the impaneling of an impartial jury. The trial judge properly denied a change of venue.

Hoppe contends that he was convicted on insufficient evidence in respect to the charges of second-degree murder and of attempted first-degree murder. In regard to the murder of Lynn Westbrook, the proof is admittedly circumstantial. Jans testified that, while she was lying on a davenport in the living room, she heard her roommate, Lynn Westbrook, scream twice, heard a thud, and then silence. She testified that both Holland and Hoppe were in the bedroom at the time of the first scream. She testified that Hoppe emerged from the bedroom perspiring heavily, and with a crazy look on his face.

No one testified to seeing the crime committed. The direct evidence, however, of Jans was sufficient to place Hoppe in the room at or about the time of the crime. Hoppe denied that he killed Westbrook. However, his denial and his protestation of innocence do not, in themselves, as a matter of law, establish a reasonable doubt that Hoppe was the criminal. The jury was the sole judge of credibility and could properly refuse to believe Hoppe's version of what happened.

Hoppe argues, however, that the circumstances themselves indicate that he could not have committed the crime. It is undisputed that the death of Lynn Westbrook was caused by strangulation. It is therefore argued by Hoppe that, had he been strangling Westbrook at the time Jans testified as to her belief that he was then committing the crime, the murdered woman would not have been able to scream. This overlooks the medical evidence that the strangulation and eventual death was

not caused by pressure on the windpipe but was rather caused by an oxygen deficiency resulting from pressure on the blood vessels at the side of Westbrook's neck. There is nothing in the record to show that pressure thus applied would have prevented the screams.

Although defense counsel on appeal appeared to argue that medical testimony indicated that Westbrook could not have screamed during the strangulation process, a careful search of the record has revealed no such evidence, and the inference to be drawn from the medical testimony is to the contrary—that the air passages were not blocked during the strangulation process and screaming would not have been prevented.

There is sufficient circumstantial evidence which if believed by the jury would be sufficient to sustain the conviction of second-degree murder beyond a reasonable doubt.

While Hoppe testified that, after the incident described by Jans, the other participant, Holland, was in the room with Westbrook and engaged in conduct which Hoppe believed might have caused the death, the jury was not obliged to believe such testimony, and the mere possibility that someone else committed the crime did not give rise to a reasonable doubt, as a matter of law, that the crime was committed by Hoppe.

While the evidence was circumstantial, if believed by the jury, as it was, it was sufficient to sustain a conviction beyond a reasonable doubt.

Shortly after the time at which Jans believed Hoppe strangled Westbrook, Hoppe, according to the testimony of Jans, said that he had to kill her (Jans) because she had seen and heard too much. She testified that Hoppe then attempted to strangle her. Jans said she broke free and Hoppe again attempted to strangle her. At this point when, according to Jans, Hoppe was strangling her, Jans testified that there was a knock on the door, and Hoppe then desisted from further strangulation efforts. Jans

testified that shortly thereafter, when Hoppe's attention was diverted, she escaped through the back door and fled upstairs to an apartment occupied by male college students.

Hoppe was found guilty of attempted first-degree murder.

"Attempt" is defined in sec. 939.32 (2), Stats.:

"(2) An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor."

In the instant case the intent to kill was evidenced by the statement of Hoppe that Jans had seen too much and that he would have to kill her. Hoppe, however, contends that he abandoned any attempt to kill Jans and that, after a brief initial strangulation period, he desisted, saying, "My God, I can't do it." Jans stated that he only desisted at the time a knock was heard at the door.

The burden was upon the state to prove that Hoppe undertook the commission of murder by overt acts which demonstrated unequivocally that he formed the intent to kill Jans and would have killed her except for the intervention of some extraneous factor. The specific intent was spelled out by the express statement of Hoppe, and there was also overwhelming evidence that he commenced the act of strangulation. The principal issue posed on the appeal, however, is whether he voluntarily desisted or whether he desisted only because of the extraneous circumstances—the knock at the door.

The evidence that there were overt acts manifesting the intent to kill are overwhelming. The question posed to the jury was whether the defendant's alleged voluntary cessation of the strangulation terminated that intent and that whatever intent he might have had originally ended

when of his own volition he concluded, "I can't do it." This raises a question of credibility. The jury was free either to believe Hoppe—that of his own volition he concluded that he could not proceed with the strangulation— or to believe Jans' version that he ceased only when there was a knock at the door. The jury adopted Jans' version of the incident.

The determination of the credibility of witnesses is the sole province of a jury and will not be reversed by this court unless the testimony of a witness is incredible as a matter of law. *Austin v. State* (1971), 52 Wis. 2d 716, 190 N.W. 2d 887.

Jans testified that she was struggling and resisting and attempting to break loose at or about the time that the knock came at the door. Such resistance was held to be extraneous and not volitional in *Adams v. State* (1973), 57 Wis. 2d 515, 523, 204 N.W. 2d 657. Therein we said:

"We are satisfied here that the resistance offered by the complainant constituted a valid extraneous factor within the contemplation of sec. 939.32 (2), Stats."

Under the state of this record, the jury could properly believe that murder would have been committed were it not for the knock at the door and the struggles of the victim which prevented the earlier accomplishment of the crime.

The defendant also argues that the district attorney followed a pattern of leading questions and improper remarks to a degree that prejudiced the jury and denied the defendant due process. A motion for mistrial on this ground was made during and after trial and is properly preserved in the record. Like the motion for change of venue for prejudice, a motion for mistrial on the grounds of improper prosecutorial conduct is addressed to the sound discretion of the trial court and will not be reversed by this court unless there is evidence of abuse of

discretion and prejudice to the defendant. *State v. Davidson* (1969), 44 Wis. 2d 177, 194, 170 N.W. 2d 755; *Embry v. State* (1970), 46 Wis. 2d 151, 161, 174 N.W. 2d 521.

It is the duty of the prosecutor to deal fairly with the accused, and statements by the prosecutor that he believes, on the basis of facts known to him but not revealed to the jury, that a defendant is guilty is sufficient to warrant a reversal. It is, however, the general rule that improper remarks by a prosecutor are not necessarily prejudicial where objections are promptly made and sustained and where curative instructions and admonitions are given by the court. *State v. Davidson, supra; State v. Bergenthal* (1970), 47 Wis. 2d 668, 682, 178 N.W. 2d 16. Where, however, the pattern of misconduct by a prosecutor is egregious and repetitive, objections and curative instructions may be insufficient to dispel the prejudice to the defendant. *Berger v. United States* (1935), 295 U.S. 78, 55 Sup. Ct. 629, 79 L. Ed. 1314.

A review of the record indicates that, during the course of an extensive trial reported in 1500 pages of transcript, approximately 20 objections were made on the ground of leading questions. Fourteen of these objections were sustained. Although these questions revealed an inartfulness on the part of the prosecutor, in the main they did not go to the question of Hoppe's guilt. They were more probative of the prosecutor's ineptness than they were of any intent to prejudice the defendant. On those questions which arguably could have prejudiced the defendant, the trial judge severely admonished the district attorney and instructed the jury to disregard the questions.

The district attorney on occasion used inappropriate and unlawyerlike language in respect to Hoppe and Holland. Specifically, he referred to them as "those birds." He also indulged in inappropriate language when he criticized defense counsel's efforts to secure an answer

from a witness. These statements, however, did not go to Hoppe's guilt. In each case defense counsel's objection was sustained, and at one point the district attorney was admonished by the court. The district attorney's epithets were not those of an experienced professional, but they were not conscious or deliberate attempts to malign or prejudice Hoppe. We do not deem these remarks so prejudicial as to deprive the defendant of a fair trial. The defense counsel is to be commended for his prompt objections. The trial judge appropriately ruled on the objections and prevented prosecutorial conduct that might have resulted in prejudice to the defendant had the prosecutor's course of conduct gone unchallenged.

Defense counsel on this appeal also argues that the prosecutor made improper comments in respect to the evidence in the course of closing arguments. While it is clear that at one point the prosecutor clearly was about to give his own opinion, not based on the evidence, of what actually went on in the bedroom where Lynn Westbrook was strangled, a prompt objection was sustained, and the opinion of the prosecutor was never given.

In each case where the defense counsel objected to statements during closing argument, the objection was sustained and the jury was admonished to disregard the prosecutor's statements. It would appear that the prosecutor was awkwardly attempting to state his theory of the case, a tactic which is not in itself objectionable. To the extent that his method of propounding his theory of the case was objectionable, the trial court's vigilance prevented prejudice to the defendant. Furthermore, the trial judge, prior to closing arguments, advised the jury that what they were about to hear from counsel was not evidence and could not be relied upon instead of evidence in the record. A similar admonition was given to the jury just prior to the commencement of the deliberations.

We conclude that the trial judge did not abuse his discretion in concluding that the defendant had not been deprived of a fair trial by reason of prejudicial prosecutorial misconduct.

Counsel also asks that a new trial be granted in the interest of justice on the cumulative ground that numerous errors predisposed the jury to convict Hoppe despite the fact that the evidence was insufficient for conviction. He also argues that, under the evidence, the jury could as reasonably have believed that Hoppe's companion and not Hoppe was responsible for the crime.

A defendant is guaranteed a fair trial. In the instant case we cannot conclude, however, that Hoppe was denied that right. Even the alleged errors, when considered cumulatively, do not reach such magnitude that we can conclude that the defendant was not afforded his proper day in court.

We have stated that we will not grant a request for a new trial in the interest of justice where two inferences could have been drawn by the jury, one of which was consistent with the defendant's argued innocence. We said in *Garrella v. State* (1973), 61 Wis. 2d 351, 354, 212 N.W. 2d 101:

> "While it is possible that another jury could interpret the testimony more favorably to the defendant, we have held that the hope that a new jury will draw different inferences from the same evidence is not sufficient reason to grant a new trial in the interests of justice."

We have frequently held that a new trial will not be granted in the interests of justice unless we can reasonably conclude that a new trial under optimum circumstances would result in a verdict of acquittal. We said in *Garrella, supra,* "A new trial will be granted only when it appears that the result will be different upon a retrial." (P. 353, 354)

In the instant case neither the claims of pretrial publicity nor the claims of prosecutorial misconduct are sub-

stantiated to a degree that we would conclude that retrial under optimum circumstances free of the alleged errors would result in a different verdict. We are satisfied that the evidence, though circumstantial, in respect to attempted first-degree murder was sufficient to prove guilt beyond a reasonable doubt.

*By the Court.*—Judgment affirmed.