STATE of Wisconsin, Plaintiff-Respondent,

v.

Lawrencia BEMBENEK, Defendant-Appellant.†

Court of Appeals

*No. 82-522-CR. Submitted on briefs January 12, 1982.—
Decided February 14, 1983.*
(Also reported in 331 N.W.2d 616.)

† Petition to review denied.

618

For the defendant-appellant the cause was submitted on the briefs of *Eisenberg, Giesen, Ewers & Hayes, S.C.,* by *Donald S. Eisenberg* and *Morris D. Berman,* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Pamela Magee-Heilprin,* assistant attorney general.

Before Decker, C.J., Moser, P.J., and Wedemeyer, J.

MOSER, P.J.  Lawrencia Bembenek (Bembenek) appeals from a judgment of conviction entered March 9, 1982, following a jury trial in which she was found guilty of first-degree murder, contrary to sec. 940.01, Stats.  We affirm.

Bembenek was convicted for the first-degree murder of Christine Schultz (Christine).  Christine was the former wife of Milwaukee Police Detective Elfred Schultz (Schultz).  Following his divorce from Christine, Schultz married Bembenek.  At the time of her murder, Christine resided at 1701 West Ramsey Street in the city of Milwaukee with her two children, Sean and Shannon.

In the early morning hours of May 28, 1981, an intruder entered Christine's home. The intruder went into the boys' bedroom and placed a gloved hand around the face of Sean and attempted to tie something around his neck. Sean screamed and the intruder left and went into Christine's bedroom. Sean testified that he then heard a loud bang which sounded like a firecracker. He then saw the intruder flee down the stairs.

Sean went to his mother's bedroom and telephoned Stuart Honeck (Honeck), Christine's boyfriend. Honeck telephoned the police and told them to send a squad car and the paramedics to Christine's home.

Upon arriving at the scene, the police discovered Christine's body on the bed in her bedroom. Her left wrist was bound with clothesline and there was a bandanna-type handkerchief tied about her face in a gag fashion. After examining the body, the police discovered a single strand of reddish-brown hair-like material on her right calf. The police also recovered other hairs from the bandanna gag.

The medical examiner testified that Christine died from a single gunshot wound which passed through her heart. The medical examiner concluded that the weapon which fired the fatal shot was either touching or extremely close to Christine's body when it was fired.

At the time of the murder, Schultz was on duty. When he was informed of his former wife's murder, he proceeded to the scene with his partner. Following this, he went to his residence with Detective Michael Durfee (Durfee). Detective Lieutenant Richard Abrams told Durfee to take Schultz home and check his offduty revolver. Durfee examined the revolver and concluded that it had not been recently fired. Durfee returned the revolver to Schultz. On June 18, 1981, Schultz's offduty revolver was examined by ballistics experts at the state crime laboratory, who determined that the bullet which killed Christine was fired by this revolver.

On June 10, 1981, a plumber was sent to the apartment of the former neighbors of Schultz and Bembenek to alleviate overflow problems with their toilet. The plumber discovered that a wig was caught in a drainage pipe into which the plumbing from both Schultz's and Bembenek's former apartment and their neighbors' apartment flowed. The fibers from this wig were analyzed by experts at the state crime laboratory, who found that these fibers were consistent with fibers found on Christine's right calf.

Bembenek was arrested on June 24, 1981, at Marquette University, where she was employed by the Public Safety Department. Following her arrest, her locker at the Public Safety Department was inventoried by her supervisor, Thomas Conway (Conway). Milwaukee Police Department Detectives Thomas Repischak and Michael Jankowski were present during the inventorying of the locker. A hairbrush belonging to Bembenek, found during the inventory, was turned over to these detectives. The hair found in the brush was tested by experts at the state crime laboratory, who found that these hairs were consistent with the hairs found in the bandanna used to gag Christine.

A jury found Bembenek guilty of first-degree murder on March 9, 1982. Judgment of conviction was entered the same day and Bembenek was sentenced to life imprisonment. Bembenek appeals from this judgment.

Further facts will be delineated as are necessary during the discussion of the issues.

Bembenek raises the following issues on appeal:

(1) whether the criminal complaint was sufficient to support the trial court's finding of probable cause;
(2) whether the evidence adduced at the preliminary hearing was sufficient to support a bindover;
(3) whether the trial court erred by denying her motion to suppress the evidence found during the inventory of her locker at Marquette University;

(4) whether she was prejudiced by the prosecutor's conduct during the trial;
(5) whether she was prejudiced by the partiality of the trial court;
(6) whether the trial court abused its discretion by refusing to strike the testimony of an expert witness for the State because of the expert's violation of the trial court's sequestration order;
(7) whether her conviction should be reversed in the interests of justice;
(8) whether her conviction should be reversed because the verdict was contrary to the weight of the evidence; and,
(9) whether the trial court erred by giving the standard Wisconsin criminal jury instruction regarding burden of proof and reasonable doubt.

## SUFFICIENCY OF THE COMPLAINT

Bembenek argues that the instant criminal complaint is insufficient because it fails to establish probable cause that she murdered Christine. We disagree.

A criminal complaint is a self-contained charge which must set forth facts that are sufficient, in themselves or together with reasonable inferences to which they give rise, to allow a reasonable person to conclude that a crime was probably committed and that the defendant is probably culpable.[1] When the sufficiency of a criminal complaint is challenged, the alleged facts in the complaint must be sufficient to establish probable cause, not in a hypertechnical sense, but in a minimally adequate way through a common-sense evaluation by a neutral magistrate making a judgment that a crime has been committed.[2] The magistrate need only be able to answer

[1] *State v. Hoffman*, 106 Wis. 2d 185, 197–98, 316 N.W.2d 143, 151 (Ct. App. 1982).

[2] *State v. Williamson*, 109 Wis. 2d 83, 87, 325 N.W.2d 360, 363 (Ct. App. 1982).

the hypothetical question: "What makes you think the defendant committed the offense charged?"[3] It is sufficient if the complaint answers the following questions: What is the charge? Who is charged? When and where is the offense alleged to have taken place? Why is this particular person being charged? and, Who says so?[4]

After reviewing the instant criminal complaint we are satisfied that it answers all of the required questions. As to the first question, "What is the charge?," the complaint states that the charge is first-degree murder, contrary to sec. 940.01, Stats. As to the second question, "Who is charged?," the complaint states that Lawrencia Bembenek is charged with the crime listed. As to the third question, "When and where is the offense alleged to have taken place?," the complaint states that the offense occurred May 28, 1981, at 1701 West Ramsey Street, Milwaukee, Wisconsin.

As to the fourth question, "Why is this particular person being charged?," the complaint contains numerous exhibits which establish that Bembenek probably committed the crime charged. Exhibit D establishes that there was no evidence of forced entry found. Exhibit S establishes that Bembenek had access to a key to Christine's residence. Exhibit M establishes that it was Schultz's offduty revolver which was the murder weapon. Exhibit F establishes that Bembenek was the only person who had access to this revolver during the period of time in question.

Exhibit N establishes that a wig was found in a drainage pipe into which the plumbing from both Schultz's and Bembenek's former apartment and their neighbors' flowed. This exhibit also establishes that the wig could only have been flushed down the toilet of the Schultz/

[3] *Id.*
[4] *Id.*

Bembenek apartment or their neighbors' apartment. Exhibit R establishes that the fibers from the wig were consistent with the hair-like fiber found on Christine's right calf.

Exhibits G and H establish that Bembenek had told her former roommate's mother that, because of the high alimony payments that her husband had to make to Christine, she (Bembenek) should have Christine "blown away." There can be no question that the instant criminal complaint satisfactorily answers the fourth question.

As to the fifth question, "Who says so?," the complaint contains an affidavit of the complainant, Milwaukee Police Detective Frank Cole, who identified himself as an officer assigned to investigate the Christine Schultz murder. The affidavit goes on to list all the exhibits attached to the complaint, who made them and the reliability of the maker. Thus, the instant criminal complaint clearly answers the fifth question.

Bembenek contends that, because this case involves circumstantial evidence, the standard required to establish probable cause is the same as that which would justify a conviction. We disagree.

It is well-settled that the complaint need not establish a defendant's guilt beyond a reasonable doubt.[5] The complaint is the first of many steps in a criminal prosecution. Its essential function is informative, not adjudicative.[6] Therefore, we hold that, even though a case rests partially or entirely on circumstantial evidence, the standard for determining probable cause in the criminal complaint is the same as the standard required to find probable cause in a case based on direct evidence.

Bembenek also contends that probable cause must be found to believe that the assailant involved was a female. We disagree.

---

[5] *Hoffman, supra* note 1, at 200, 316 N.W.2d at 152.
[6] *State v. Olson,* 75 Wis. 2d 575, 583, 250 N.W.2d 12, 17 (1977).

■

There is no requirement that the sex of the alleged assailant be established before probable cause in a criminal complaint can be found. The only requirement is that the facts in the complaint establish probable cause in a minimally adequate way, not in such a hypertechnical way.[7]

The trial court made a common-sense evaluation of the complaint and concluded that the charges were not the result of caprice and that further criminal proceedings were justified. We are also satisfied that the complaint meets all the requirements to justify further criminal proceedings. Accordingly, we hold that the criminal complaint is sufficient.

## SUFFICIENCY OF THE PRELIMINARY HEARING

Bembenek next argues that the evidence adduced at the preliminary hearing was insufficient to support a bindover. We disagree.

■

Our standard of review when we evaluate the evidence at a preliminary hearing has been stated as follows:

> The reviewing court can examine the evidence only sufficiently to discover whether there was any substantial ground for the exercise of judgment by the committing magistrate. When the reviewing court has discovered that there is competent evidence for the judicial mind of the examining magistrate to act on in determining the existence of the essential facts, it has reached the limit of its jurisdiction and cannot go beyond that and weigh the evidence.[8] [Citations omitted.]

---

[7] See *Williamson, supra* note 2.

[8] *State v. Hess*, 99 Wis. 2d 22, 31, 298 N.W.2d 111, 115 (Ct. App. 1980), *quoting State v. Sirisun*, 90 Wis. 2d 58, 61–62, 279 N.W.2d 484, 485 (Ct. App. 1979).

A review of the transcript of the preliminary hearing establishes that the following evidence was adduced at the preliminary hearing:

(1) that the wig found in the drainage pipe could have come only from the Schultz/Bembenek apartment or their neighbors' apartment;

(2) that Bembenek stated that because of the alimony payments she should have Christine "blown away;"

(3) that Bembenek's roommate saw a green jogging suit which belonged to either Schultz or Bembenek;

(4) that a fellow police trainee of Bembenek saw her wearing a green jogging suit;

(5) that Christine's son, Shannon, saw the assailant wearing a green jogging suit;

(6) that Schultz's offduty revolver was the weapon used to murder Christine; and,

(7) that at the time in question only Bembenek had access to Schultz's offduty revolver.

Again, Bembenek contends that, because this case is based on circumstantial evidence, the standard required to establish probable cause to support a bindover is the same as that required to support a conviction based on circumstantial evidence. We disagree.

The determination to be made by the magistrate at a preliminary hearing is that further criminal proceedings are justified. A preliminary hearing is not an evidentiary trial. There is no requirement that guilt beyond a reasonable doubt be established before a defendant may be bound over.[9] Preliminary hearings, like initial determinations of probable cause, are concerned with the practical and nontechnical probabilities of everyday life in determining whether probable cause exists, not the hypertechnical determinations required to support a conviction based on circumstantial evidence.[10]

---

[9] *Taylor v. State*, 55 Wis. 2d 168, 172–73, 197 N.W.2d 805, 807 (1972).

[10] *See id.* at 173, 197 N.W.2d at 807.

Accordingly, we hold that there was sufficient competent evidence presented to the trial court to support the bindover of Bembenek.

## SUPPRESSION OF EVIDENCE

Bembenek next argues that the trial court erred when it denied her motion to suppress the evidence obtained during the inventory of her locker at the Public Safety Department of Marquette University. We disagree.

On review of an order granting or denying a motion to suppress evidence, the findings of fact, if any, by the trial court will be sustained unless they are contrary to the great weight and clear preponderance of the evidence. However, appellate courts will independently examine the circumstances of the case to determine whether the constitutional requirements of reasonableness are satisfied.[11]

Bembenek contends that the inventory of her locker by the Marquette Public Safety Department, which resulted in the discovery of a hairbrush containing her hairs, was a *de facto* governmental search, thereby bringing the search within the purview of the fourth amendment. We disagree.

It is a long-established rule that the constitutional guarantee against unlawful searches and seizures applies only to actions of government agents and not private individuals.[12] A private search is beyond the reach of the exclusionary rule.[13] One of the reasons for the exclusion-

---

[11] *State v. Callaway*, 106 Wis. 2d 503, 511, 317 N.W.2d 428, 433 (1982).

[12] *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). Wisconsin has recognized the *Burdeau* rule. *State v. Jenkins*, 80 Wis. 2d 426, 430, 259 N.W.2d 109, 111 (1977).

[13] *Jenkins, supra* note 12.

ary rule is to deter the police from illegal searches by denying them convictions based on the fruits of illegal searches. The policy behind not applying the exclusionary rule in private searches is that private individuals will not be so deterred, because they have less knowledge of criminal procedure and are not interested in getting convictions.[14]

There is no question that Conway, the Marquette University public safety officer who conducted the inventory, was a private person within the meaning of the fourth amendment limitations. The record reflects that Conway was not searching the locker to discover evidence relating to the crime for which Bembenek had been arrested. Conway testified that he was merely inventorying the locker because he wanted to ascertain whether Bembenek had any Marquette public safety equipment in her locker. Conway also stated that he wanted to list Bembenek's personal property so that she could not later claim that something was missing. Conway stated that he would have inventoried the locker even if the police had not been present. The evidence in question was discovered in a purse belonging to Bembenek. Conway testified that he searched the purse only to see if it contained any money, not to discover evidence of a crime.

Bembenek cites this court to *United States v. Mekjian*[15] and *United States v. Clegg*,[16] and argues that, because the police had preknowledge of the search, Conway became a *de facto* agent of the police. We disagree.

In *Clegg*, the fifth circuit stated, "[i]t is only when the government has preknowledge of and yet acquiesces in a private party's conducting a search and seizure which

---

[14] *Id.* at 431, 259 N.W.2d at 112.
[15] 505 F.2d 1320 (5th Cir. 1975).
[16] 509 F.2d 605 (5th Cir. 1975).

the government itself, under the circumstances, could not have undertaken" that the problem discussed in *Mekjian* arises.[17] That court held that the search there was not a governmental search because the government did not have any knowledge that the private search being conducted was the type which would be a violation of the fourth amendment if it would have been undertaken by the government.[18] In *Mekjian,* the government had knowledge that a private individual was copying records which established that the defendant was committing medicare fraud and they tacitly acquiesced to her conduct. The *Mekjian* rule is not applicable to this case. Here, the police could not have had any knowledge that Conway was engaging in a search which, if conducted by them, would be violative of the fourth amendment, because Conway was merely inventorying the locker and not searching for evidence of a crime.

In *United States v. Gomez,*[19] the ninth circuit rejected a contention that the mere presence of law enforcement officials at the search of a suitcase by an airline's employee converted the search into a governmental search. The airline's employee in *Gomez* merely searched the suitcase to ascertain the identity of the owner. The court held that, based on this motivation for the search, even slight participation by officers did not convert it from a private search to a governmental one.[20]

Here, as in *Gomez,* the search was not done in order to discover evidence of a crime to be used to obtain a conviction. The police officers did not initiate, encourage or participate in any way in the inventory. The police officers did not remove any property from Bembenek's locker. The hairbrush, which was eventually seized, was removed from the purse by Conway. Only after it was

---

[17] *Id.* at 609.
[18] *Id.* at 610.
[19] 614 F.2d 643, 645 (9th Cir. 1980).
[20] *Id.*

placed on a bench in the locker room did the police seize it. Accordingly, we hold that the trial court's finding that this was a private search and not subject to the fourth amendment protections was not contrary to the great weight and clear preponderance of the evidence.

## PROSECUTORIAL MISCONDUCT

Bembenek next argues that statements made by the prosecutor during his opening statement and the cross-examination of certain witnesses were improper and that the trial court erred when it denied her motion for mistrial following these remarks. We disagree.

A motion for mistrial on the grounds of improper prosecutorial conduct is addressed to the sound discretion of the trial court and the trial court's decision will not be reversed by this court unless there is evidence of abuse of discretion and prejudice to the defendant.[21] It is the general rule that improper remarks by a prosecutor are not necessarily prejudicial where objections are promptly made and sustained and where curative instructions and admonitions are given by the court.[22] Where a trial court gives the jury a curative instruction, the appellate court may conclude that such instruction erased any possible prejudice, unless the record supports the conclusion that the jury disregarded the trial court's admonition.[23]

Bembenek contends that the prosecutor's opening statements relative to sounds emanating from the boys'

[21] *Hoppe v. State*, 74 Wis. 2d 107, 119–20, 246 N.W.2d 122, 130 (1976).

[22] *Id.* at 120, 246 N.W.2d at 130.

[23] *Genova v. State*, 91 Wis. 2d 595, 622, 283 N.W.2d 483, 495 (Ct. App. 1979).

bedroom on the night of the murder, and Christine's hearing screams coming from the boys' bedroom were improper and prejudicial. The trial court sustained Bembenek's objection to the first statement. The trial court also gave curative instructions concerning the jury's entirely disregarding any question to which an objection was sustained and statements by either counsel as not being evidence in the case. Therefore, we conclude that the trial court did not abuse its discretion by denying Bembenek's motion for mistrial because these statements were not prejudicial to Bembenek.

Bembenek also contends that a statement made by the prosecutor during cross-examination relating to Laurie Futh's having seen a picture taken by Bembenek which contained, in the background, a clothesline similar to that used in Christine's murder, was improper and prejudicial. The photographs were not in evidence nor was Futh called to testify for the State. Bembenek further contends that the prosecutor's questions during his cross-examination of her about her use of marijuana at a rock concert and her violations of her conditions of bail were improper and prejudicial.

As to the questions concerning Futh, the record reflects that Bembenek did not object to this line of questioning, except as to the form of certain questions. Following the close of questioning, Bembenek moved for a mistrial based on these claimed prejudicial questions. The trial court denied the motion. Our review of the record leads this court to the conclusion that the trial court did not abuse its discretion when it denied this motion because these questions were not prejudicial to Bembenek.

■■■■

Pertaining to the questions regarding the smoking of marijuana, Bembenek objected to the questions and the trial court sustained the objection. Because the trial

court gave the curative instruction concerning the jury's disregarding questions to which objections had been sustained, we conclude that the trial court did not abuse its discretion by denying Bembenek's motion for mistrial. As to the questions regarding the violation of her conditions of bail, we conclude that the trial court did not abuse its discretion when it denied Bembenek's motion for mistrial because the questions were not prejudicial.

Bembenek also argues that the State implied that she had an obligation to produce evidence. During the cross-examination of a Milwaukee Journal photographer, Bembenek's counsel asked if there was photographic equipment available to the district attorney which would allow them to discover the color of a jogging suit worn by Bembenek in a black and white photograph. The trial court sustained the State's objection. On redirect, the State was allowed to ask if this equipment was available to Bembenek's counsel. The trial court overruled Bembenek's objection. We conclude that the trial court erred by overruling Bembenek's objection after it had sustained the State's similar objection; however, we hold that this error was harmless because it did not affect the substantial rights of Bembenek.[24]

## JUDICIAL MISCONDUCT

Bembenek next argues that because the trial court did not remain impartial and disinterested she was denied a fair trial. We disagree.

We have reviewed the extensive record of the trial in this appeal and conclude that, while there is some evidence of impatience shown by the trial court, the trial court's conduct was neither improper nor prejudicial to

[24] Secs. 805.18(2) and 901.03(1)(a), Stats.

Bembenek.[25] Any statements made by the trial court which seemed unduly harsh to Bembenek were made in the course of the trial court's duty to control the trial.[26]

## VIOLATION OF SEQUESTRATION ORDER

Bembenek next argues that the trial court should have stricken the testimony of an expert for the State because the expert violated the trial court's sequestration order. We disagree.

When a witness violates a sequestration order, the decision as to whether a witness should be allowed to testify is generally left to the sound discretion of the trial court.[27] Our supreme court has held that a witness who has violated a sequestration order should not be allowed to testify where the defendant has been prejudiced by this violation and the party calling the witness was a guilty participant in the violation.[28] However, if there is no prejudice to the defendant, it is not error to allow a witness to testify even if the party calling the witness participated in the violation.[29]

At the commencement of the trial, the trial court imposed a sequestration order upon all the witnesses. The order excluded the witnesses from the courtroom during the proceedings and prohibited them from discussing their testimony with one another. Diane Hansen (Hansen) was called as an expert witness for the State. She testified about her examination of hairs found in the

[25] *See Flowers v. State,* 43 Wis. 2d 352, 364–65, 168 N.W.2d 843, 850 (1969).

[26] Sec. 906.11(1), Stats.

[27] *Nyberg v. State,* 75 Wis. 2d 400, 409–10, 249 N.W.2d 524, 528–29 (1977).

[28] *Id.* at 408, 249 N.W.2d at 528, *citing Loose v. State,* 120 Wis. 115, 121, 97 N.W. 526, 528 (1903).

[29] *Id.* at 409, 249 N.W.2d at 528.

bandanna gag and hairs found in Bembenek's hairbrush. Hansen testified that the hairs from the bandanna gag and the hairbrush were consistent. On cross-examination, Hansen stated that she was familiar with a treatise on hair analysis because she was told by Arthur Varriale that Bembenek's counsel had referred to that book during his cross-examination. Mr. Varriale had testified as an expert witness for the State prior to Hansen. The trial court found that there had been a violation of the sequestration order, but refused to strike Hansen's testimony.

The record reflects that the State was not a participant in this violation of the sequestration order. We do not believe that this violation prejudiced Bembenek. Accordingly, we hold that the trial court did not abuse its discretion when it refused to strike the testimony of Hansen.

## INTERESTS OF JUSTICE

Bembenek next argues that her conviction should be reversed in the interests of justice. We disagree.

This court has the discretionary power to reverse a judgment if it determines that it is probable that justice for any reason has miscarried.[30] In order for an appellate court to grant a new trial in the interests of justice, "[s]uch grave doubt must exist regarding a defendant's guilt to induce the belief that justice has miscarried."[31] We will not grant a new trial in the interests of justice unless we can reasonably conclude that a new trial under

[30] Sec. 752.35, Stats.
[31] *Day* v. *State*, 92 Wis. 2d 392, 406, 284 N.W.2d 666, 673 (1979).

optimum circumstances would result in a verdict of acquittal.[32]

We have reviewed the record in this case and conclude that it does not raise grave doubts about Bembenek's guilt. We do not believe that a new trial would result in a verdict of acquittal. Accordingly, we decline to reverse Bembenek's conviction in the interests of justice.

## WEIGHT OF THE EVIDENCE

Bembenek next argues that when all the evidence presented at the trial is considered by this court, this court must hold that that evidence was of insufficient weight to support her conviction. Bembenek contends that we should act as a thirteenth juror and weigh the evidence presented at the trial to determine whether we agree with the jury's verdict. We decline to do so.

The basis for this argument is the distinction Bembenek draws between sufficiency of the evidence and weight of the evidence. When this court reviews a challenge to the sufficiency of the evidence, the test is whether the evidence adduced, believed and rationally considered by the finder of fact was sufficient to prove the defendant's guilt beyond a reasonable doubt. This test requires that this court be satisfied that the finder of fact, on the credible evidence submitted, could find the defendant guilty beyond a reasonable doubt.[33]

Bembenek finds support for a challenge to a conviction based on the weight of the evidence in *Tibbs v. Florida.*[34]

---

[32] *Hoppe, supra* note 21, at 122, 246 N.W.2d at 131.

[33] *Maclin v. State*, 92 Wis. 2d 323, 331–32, 284 N.W.2d 661, 665 (1979).

[34] *Tibbs v. Florida,* —— U.S. ——, 102 S. Ct. 2211 (1982).

In *Tibbs,* the United States Supreme Court noted the distinction the Florida Supreme Court made between sufficiency of the evidence and weight of the evidence:

As the court explained, a conviction rests upon insufficient evidence when, even after viewing the evidence in the light most favorable to the prosecution, no rational factfinder could have found the defendant guilty beyond a reasonable doubt. A reversal based on the weight of the evidence, on the other hand, draws the appellate court into questions of credibility. The "weight of the evidence" refers to "a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other."[35] [Footnote and citation omitted.]

The United States Supreme Court in *Tibbs* did not require state appellate courts to utilize the "weight of the evidence" analysis when reviewing a conviction. *Tibbs* merely holds that, if a state appellate court does use the "weight of the evidence" analysis to reverse a conviction, the double jeopardy clause does not bar a retrial of the defendant.[36] Indeed, the Florida Supreme Court itself rejected this analysis in *Tibbs v. State.*[37] The Florida Supreme Court, noting the questionable validity of the "weight of the evidence" analysis, stated: "Henceforth, no appellate court should reverse a conviction or judgment on the ground that the weight of the evidence is tenuous or insubstantial."[38]

We, like the Florida Supreme Court, doubt the validity and also the utility of the "weight of the evidence" analysis. It has long been held in Wisconsin that an appellate court will not retry a case.[39] The only time an

---

[35] *Id.* at ——, 102 S. Ct. at 2216.

[36] *Id.* at ——, 102 S. Ct. at 2221.

[37] *Tibbs v. State,* 397 So. 2d 1120 (Fla. 1981).

[38] *Id.* at 1125. The Florida Supreme Court did allow the Tibbs reversal to rest on the "weight of the evidence" analysis.

[39] *Maclin, supra* note 33, at 332, 284 N.W.2d at 665–66.

appellate court will upset a jury's determination of the witnesses' credibility is when the evidence that the trier of fact has relied upon is inherently or patently incredible.[40] Our review of the record leads this court to the conclusion that the evidence relied upon by the jury here was not inherently or patently incredible. Therefore, we will not act as a thirteenth juror and weigh the evidence.

We note that Bembenek has not challenged the sufficiency of the evidence. Had a challenge been so made, we would hold that, based on the credible evidence submitted to the jury, they could have found Bembenek guilty beyond a reasonable doubt.[41]

## JURY INSTRUCTION

Lastly, Bembenek argues that the trial court erred by giving the standard Wisconsin criminal jury instruction regarding burden of proof and presumption of innocence.[42] Bembenek claims that that instruction's explanation of reasonable doubt is constitutionally infirm. We disagree.

■■■

Bembenek first maintains that that instruction's statement that a reasonable doubt is a doubt for which a reason can be given is unconstitutional because it compels the jurors to find a reason for their doubts. Our supreme court has held that this statement was free of any error.[43] Therefore, we are obligated to hold that this statement is not unconstitutional.

---

[40] *Day, supra* note 31, at 400, 284 N.W.2d at 671.

[41] *See Maclin, supra* note 33.

[42] Wis JI—Criminal 140.

[43] *See Emery v. State,* 101 Wis. 627, 655, 78 N.W. 145, 154 (1899).

Bembenek next maintains that that instruction's language which states that "a doubt which ignores a reasonable interpretation of the evidence . . . is not a reasonable doubt" is unconstitutional because it fails to remind the jury that they must acquit if there exists a competing interpretation of the evidence which is not consistent with guilt. However, in a previous paragraph of this same instruction, the jury was informed that, if they could reconcile the evidence upon any reasonable hypothesis consistent with the defendant's innocence, they were to find her not guilty. Therefore, we hold that this language is not unconstitutional.

Lastly, Bembenek maintains that this instruction is unconstitutional because it fails to instruct the jurors that a reasonable doubt may arise after considering the lack of evidence presented. The instruction states: "You are to search for the truth and give the defendant the benefit of a reasonable doubt if it exists in your minds after you have carefully considered *all of the evidence in this case.*" [Emphasis added.] Our supreme court stated, in a similar challenge to this language, that: "[i]t would be quite a technical and narrow construction of this language to hold that it excluded the right of the accused to an acquittal by reason of reasonable doubts arising from lack of evidence . . . ."[44] We are bound by this interpretation and, accordingly, we hold that this language is not unconstitutional.

*By the Court.*—Judgment affirmed.

[44] *Hedger v. State,* 144 Wis. 279, 305, 128 N.W. 80, 90–91 (1911).