BRIGGS, Plaintiff in error, v. STATE, Defendant in error.

*No. 75-754-CR. Argued February 1, 1977.—Decided March 1, 1977.*
(Also reported in 251 N. W. 2d 12.)

---

316

For the plaintiff in error the cause was argued by *Jack E. Schairer,* assistant state public defender, with whom on the briefs was *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *William L. Gansner,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

BEILFUSS, C. J.   The defendant raises several issues dealing with probable cause for the arrest, motions to suppress evidence, change of venue, admissibility of evidence, jury argument of the prosecutor, instructions to the jury, and the length of the sentence.

Joseph Milquette owned and operated the Wagon Wheel tavern near the city of Green Bay.  The front part of

the premises was the tavern and the remainder was the living quarters of the Milquette family.

Shortly before noon on October 4, 1974, Joseph Milquette and his son Douglas were in the kitchen. They heard someone enter the tavern and Joseph went into the tavern part to attend whoever it was. Douglas heard some noise and he then proceeded to the tavern doorway. He saw a man, later determined to be the defendant Briggs, wearing a ski mask and pointing a revolver at his father Joseph. Briggs demanded "the cash"—Joseph gave it to him. The telephone was ripped off the wall. Briggs then ordered the Milquettes into a bedroom and he returned to the tavern. He came back into the bedroom and ordered them to go to the basement. Briggs told Douglas to tie up his father. While Douglas was attempting to tie his father, Briggs struck him on the head. A struggle ensued between Joseph and Briggs. During the struggle Joseph was shot at close range.

After his father was shot, Douglas hit Briggs with a small sledgehammer. Another struggle developed and the ski mask Briggs was wearing came off. Briggs escaped from the struggle and fled in a green and white car which Douglas was able to observe.

Douglas drove his father to a hospital where he died shortly thereafter. His death was caused by a massive hemorrhage and circulatory collapse caused by the bullet wound.

The defendant was found guilty of third-degree murder. He had also entered a plea of not guilty by reason of mental disease or defect. In the second phase of the bifurcated trial the jury found Briggs had the mental capacity to appreciate the wrongfulness of his conduct and the ability to conform his conduct to the requirements of law.

Additional facts will be set forth below.

Prior to trial the defendant moved to dismiss charges against him claiming there was no probable cause for

the warrantless arrest. The trial court denied this motion. The defendant asserts that this denial was error.

This court has repeatedly stated that " '[p]robable cause to arrest refers to that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime.' " *Sanders v. State,* 69 Wis.2d 242, 255, 230 N.W.2d 845 (1975).

On October 4, 1974, after the shooting, Douglas drove his father to the hospital. At the hospital he discussed the robbery and shooting with Officer Michael Schrickel of the Brown County Sheriff's Department. Douglas stated the gunman's mask came off during the struggle and he could identify the gunman. He stated the gunman had blond hair that curled up in back and was about five feet ten inches tall. Douglas saw the gunman leave the tavern in an approximately 1965 white over green Rambler. He stated he saw a car like this for sale in the summer of 1974 on the same road that he lived on, Marlee Road, and was sure the car leaving the tavern was the same car he had seen on Marlee Road, north of Highway 29, on the west side of the road.

Officer Schrickel telephoned the information to his supervisor, Captain Landry. Landry gave this information to Robert Tonn of the sheriff's department. Landry and Tonn then proceeded to the area described by Douglas. They met three other officers and established surveillance of the house from a distance. Officers Landry and Tonn, along with other officers, proceeded to the house. Through an open garage door they observed the green and white Rambler described by Douglas. Landry rang the doorbell; there was no immediate answer. The defendant then walked out of a side exit to the house into the garage. The garage was attached to the residence. He walked toward the sheriff's officers, who were either just inside or just outside the door, and he was arrested.

The distinctive vehicle which Douglas saw leaving the tavern was found at the exact location where he stated he had previously seen it. The description of the assailant matched that of Daniel Briggs. These facts, together with the description of the crime, could lead a reasonable police officer to believe the defendant probably committed a crime. Probable cause to arrest existed when the arrest was made.[2] The arrest was lawful.

Defense counsel made a pretrial motion to suppress written and oral statements and physical evidence. This motion was denied and counsel advances three reasons why he believes it was error to deny this motion.

Immediately after the defendant's arrest, prior to giving any *Miranda* warnings, Captain Landry asked "where is the gun?" The defendant responded that it was in his closet in the house. Although this statement was not used against the defendant at the trial on the third-degree murder charge, the defendant claims it gave the police impermissible leads. He argues the subsequent written and oral statements and evidence obtained as a result of a search pursuant to a warrant should have been suppressed as fruit of the poisonous tree.

In *Wong Sun v. United States,* 371 U.S. 471, 488 (1963), the Supreme Court noted that the appropriate question to be answered when evidence is obtained illegally and further evidence is later obtained is:

". . . 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' . . ."

None of the evidence the defendant objects to was obtained by the exploitation of the initial statement. We

---

[2] *See Chambers v. Maroney,* 399 U.S. 42, 46 (1970).

need not, therefore, determine whether that initial statement was illegally obtained. The defendant and his car matched the description given by Douglas and he was arrested. The arrest took place at the defendant's home within an hour of the robbery and shooting. The police did obtain a search warrant to search the home and rightfully so. The statements the defense sought to suppress were taken at the police station after *Miranda* warnings were given. Even if the initial statement given at the time of arrest was illegal, the subsequent statements were not linked to that statement. They were a result of routine investigative procedures. Additionally, on the way to the police station, the defendant made a volunteered, incriminating statement—"how is the guy" —which was unrelated to the initial statement. We conclude the statements of the defendant used at the trial, and the physical evidence obtained in the search, were not the fruit of the poisonous tree.

The second argument to suppress the evidence is that statements made at the Safety Building were obtained during an unreasonable period of detention and resulted in an improper "sew up" confession.

The law concerning confessions made during an unreasonably long detention has been considered several times by this court. A review of our holdings was set forth in *Klonowski v. State,* 68 Wis.2d 604, 609, 229 N.W.2d 637 (1975).

"In *Phillips v. State* (1966), 29 Wis.2d 521, 534, 535, 139 N.W.2d 41, this court said:
" '. . . [T]he right to interrogate after arrest is limited and must be for the purpose of determining whether to release the suspect or if he has been arrested without a warrant to make a formal complaint. . . . A detention for a period longer than is reasonably necessary for such limited purpose violates due process and renders inadmissible any confession obtained during the unreasonable period of the detention.'
"It was further said (p. 535):

" '. . . While one may be detained by the police and interrogated to secure sufficient evidence to either charge him with a crime or to release him, the police cannot continue to detain an arrested person to "sew up" the case by obtaining or extracting a confession or culpable statements to support the arrest or the guilt. . . .'

"In *Krueger v. State* (1972), 53 Wis.2d 345, 357, 192 N.W.2d 880, this court clarified the *Phillips* rule against 'sew-up' confessions:

" '. . . A confession does not become inadmissible as a "sew-up" confession merely because the state, prior to the confession, had information sufficient to sustain a charge. The question revolves solely on the point whether the delay was inordinate and the detention illegal. . . .'

"This rule was recently reiterated in *McAdoo v. State* (1974), 65 Wis.2d 596, 609, 223 N.W.2d 521:

" 'Any statement, even if voluntarily given by an accused, will be held inadmissible if made during a period of unreasonably long detention. *State v. Estrada* (1974), 63 Wis.2d 476, 490, 217 N.W.2d 359; *State v. Wallace, supra,* page 75; *State v. Hunt* (1972), 53 Wis.2d 734, 741, 193 N.W.2d 858.' "

The defendant was taken into custody Friday afternoon around 1 p.m. He was not taken before a magistrate until approximately 10:30 a.m., the next morning. The delay was less than twenty-four hours. Initially upon arriving at the Safety Building, the defendant was given his *Miranda* warnings and was interrogated concerning the robbery and shooting. He made a statement which was transcribed, read the statement and signed it. When the defendant finished giving his statement he removed his hat and the police noticed a scalp wound. He was taken to the hospital for medical attention and was not returned to the Safety Building until approximately 4:30 p.m. On the following morning the defendant was again questioned. He was again advised of his rights, but made another statement.

On its face this delay is not inordinate, but the inquiry does not stop there. If the purpose of the interrogations

was to secure sufficient evidence to determine whether to charge the defendant or release him, it was permissible. But if the purpose of the interrogation was to "sew up" the case by obtaining a confession or culpable statements to assure a finding of guilty, it was impermissible. *Phillips, supra* at 535, 139 N.W.2d at 47. It does not appear here that the delay was created or employed merely to "work upon" the defendant or "sew up" the case.

The third argument made by the defendant in contending that statements and evidence should have been suppressed is they were both derived from an illegal arrest. As decided above, the arrest was not illegal; it was supported by probable cause. This argument must be rejected.

The admission of the statements and physical evidence obtained pursuant to the search warrant were properly admitted.

A more serious question is the claim by the defendant that the trial court abused its discretion in denying his motion for change of venue because of community prejudice. We have heretofore stated:

"A change of venue may be a constitutional right in those cases where adverse community prejudice will make a fair trial impossible. But the question whether a fair trial will in fact be impossible, framed in the motion for change of venue is addressed to the discretion of the trial court. This discretion is sharply circumscribed, however, and must rest upon consideration of the evidentiary matter presented. Should such evidence give rise to a reasonable likelihood that a fair trial cannot be had, it is an abuse of discretion to deny a motion for change of venue. Any doubt in the mind of the trial court should be resolved in favor of the defendant, and in some cases the court may be required to act sua sponte.

"The constitutional guarantee of a fair trial before an impartial jury is not, however, synonymous with a change of venue. Change of venue is only one method of guaranteeing a fair trial; others are *voir dire* and continuance.

"The trial court's responsibility is to make inquiries of the jurors as to whether there is prejudice and to take such steps as may be necessary to insure a fair trial." *McKissick v. State*, 49 Wis.2d 537, 544–45, 182 N.W.2d 282 (1971).

In *McKissick*, the factors considered relevant in determining whether a change of venue should have been granted were listed as follows:

"The inflammatory nature of the publicity; the degree to which the adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity; the degree of care exercised, and the amount of difficulty encountered, in selecting the jury; the extent to which the jurors were familiar with the publicity; and the defendant's utilization of the challenges, both peremptory and for cause, available to him on *voir dire*. In addition, the courts have also considered the participation of the state in the adverse publicity as relevant, as well as the severity of the offense charged and the nature of the verdict returned." *Id.* at 545–46, 182 N.W.2d at 286.[2.5]

The state acknowledges that considerable publicity concerning the crime and the defendant permeated the Brown County area, but argues that it was not so persistent over an extended period of time so as to create a lasting impact. Accompanying the motion for change of venue were twelve newspaper articles, seventeen transcripts of radio broadcasts, and seven transcripts or tapes of television broadcasts. Most of these were reported in October of 1974. The latest newspaper article was dated December 20, 1974. The latest radio broadcast was December 19, 1974, and the television reports were all in early October. The defendant went to trial on January 13, 1975.

[2.5] *Accord, Jones v. State*, 66 Wis.2d 105, 109, 223 N.W.2d 889 (1974).

Where reporting is objective, informational and non-editorial, it is not considered prejudicial.[3] But even straightforward, objective reporting concerning this crime was apt to be somewhat inflammatory in nature. It is difficult to report on a shooting death which occurred incident to an armed robbery of a tavern without arousing strong emotion. The news reports contained information that described how Joseph Milquette was killed and how the defendant was apprehended. Other reports indicated that the defendant made a statement admitting "he committed the murder" and described what was obtained in a search of his home pursuant to a search warrant.

A court looking to the inflammatory nature of the publicity should be primarily concerned with the manner in which the information was presented. Uneditorialized news of an informational nature may inform possible members of a jury, but this does not necessarily make the information objectionable. News reports become objectionable when they editorialize, amount to "rabble rousing" or attempt to influence public opinion against a defendant.[4]

The participation of the state in promulgating the adverse publicity is relevant in determining whether the trial court abused its discretion in not granting a venue change. On October 4, 1974, the day of the shooting, the Brown County sheriff and district attorney called a press conference to discuss the shooting and the arrest. The press conference was short and informational in nature. The identity of the defendant was not revealed, nor was the shooting incident described with specificity.

[3] *Hoppe v. State,* 74 Wis.2d 107, 112, 246 N.W.2d 122 (1976).
[4] *Gibson v. State,* 55 Wis.2d 110, 120–21, 197 N.W.2d 813 (1972); *Sheppard v. Maxwell,* 384 U.S. 333 (1966).

On three occasions prior to moving for a change of venue, the defendant requested the court order the press to refrain from publishing reports on certain aspects of the preliminary proceedings. The court refused to issue these orders but was concerned about the effect that pretrial publicity would have on the defendant's rights. Because of its concern, the trial judge requested that members of the press not refer to the defendant's confession or to evidence from which a reader could conclude that a confession was made. He reviewed the American Bar Association Standards on pretrial publicity and fair trial.

The involvement of the state in disseminating pretrial publicity was minimal. It is not a press conference in and of itself that is objectionable because of the possibility of pretrial publicity, but the nature of the press conference and the manner in which it is conducted. This press conference was informational and did not tend to prejudice the defendant. The trial judge took those actions which he thought were permissible under law in order to prevent pretrial prejudicial publicity. The record indicates he was concerned with the right of the defendant to receive a fair trial, the right of the public to be informed, and the First Amendment rights of the press. While he refused to close the pretrial proceedings to the public or order the press not to print stories about the proceedings, he was aware that a careful jury *voir dire* would allow for a later determination on whether there was a reasonable likelihood of community prejudice.

Great care was taken in selecting the jury. The jury panel consisted of sixty people. The *voir dire* took nearly one full day. While almost all members of the panel had heard or read about the case, only two were excused for cause because of their partiality. The jury selection was considerably less difficult than in *Hoppe v. State,*

74 Wis.2d 107, 115, 246 N.W.2d 122 (1976), (18 of 52 prospective jurors stricken because of a preformed opinion as to guilt or innocence) ; *State v. Dean*, 67 Wis.2d 513, 528, 227 N.W.2d 712 (1975), *cert. denied*, 423 U.S. 1074, (26 of 68 prospective jurors excused because of preformed belief of defendant's guilt) ; and *Murphy v. Florida*, 421 U.S. 794 (1975), (20 of 78 prospective jurors excused). In those cases this court and the United States Supreme Court, respectively, found that the defendant's right to an impartial jury had been preserved. In addition to the jurors struck for cause, five peremptory challenges were exercised by the defense, instead of the statutory four.[5]

In deciding whether to grant the motion for change of venue, the issue before the trial court was whether there was a reasonable likelihood that a fair trial could not be had. Any doubt in this matter should be resolved in favor of the defendant.[6] The trial judge was aware of the standard and had no doubt that the defendant could receive a fair trial in Brown County. He carefully examined the news articles and radio transcripts and noted that as a member of the community he did not believe the case was so emotionally charged that a venue change was required.

" ' "The difficulty of impressing upon the record a true concept of the public sentiment in the county is manifest. Just as the trial judge is in a better position to weigh the testimony of witnesses who appear before him, so is he in a better position to judge of the public sentiment of the county. He is on the ground and in a position to sense, in a way that this court cannot, the true sentiment of the community and to judge much more correctly whether it is such as to prevent a fair trial on the part of the defendants." ' " *Hoppe v. State, supra* at 110–11, 246 N.W.2d at 125, quoting *State ex rel.*

---

[5] *See* sec. 972.03, Stats.

[6] *McKissick, supra* at 544, 182 N.W.2d at 286.

*Hussong v. Froelich,* 62 Wis.2d 577, 591, 215 N.W.2d 390 (1974).

Although the trial court is in a better position to determine whether community prejudice existed, we, too, have reviewed the news articles and radio and television transcripts. We agree the contents of those news sources were factual and accurate and circulated in such degree and time that they did not inflame the community against the defendant. As stated in *Irvin v. Dowd,* 366 U.S. 717, 722 (1961), "It is not required . . . that the jurors be totally ignorant of the facts and issues involved."[7]

The defendant argues that the trial court abused its discretion in denying a motion *in limine* to restrict admitting evidence of the armed robbery because a stipulation as to the facts constituting armed robbery had been entered into.

The defendant offered to plead guilty to armed robbery but the court did not accept this plea because the charge was third-degree murder, not armed robbery. The defendant's apparent trial strategy was to admit that he committed the armed robbery and then argue that the shooting did not occur in the course of the armed robbery. He argued that the armed robbery was completed when the shooting occurred and that the state could not prove the defendant "caused" the death of Joseph Milquette. Because he admitted the armed robbery the defense desired to limit testimony concerning the armed robbery, arguing that such testimony would have an accumulative prejudicial effect on the defendant. Essentially, the defense was admitting the first element of the third-degree murder charge and attempting to exclude evidence concerning this element. Although the court indicated it could not accept the guilty plea, it indicated a stipulation that the armed robbery had been

[7] *Tucker v. State,* 56 Wis.2d 728, 736, 202 N.W.2d 897 (1973).

committed might achieve the purposes sought by the defense.

The state argues that while the stipulation was discussed it was never entered into. The court moved forward carefully. Because of its concern that the stipulation be entered into voluntarily, the court questioned the defendant concerning the stipulation. The prosecutor was present during this entire discussion; he did not formally enter into the stipulation but did not object to the procedure. When defense counsel noted that the effect of the stipulation would be to reduce the number of witnesses called, the prosecutor responded that this might not be the case.

The issue created was—what was the effect of the stipulation? Was the prosecutor precluded from introducing evidence concerning the armed robbery because the defendant admitted the robbery? The crime of third-degree murder is statutorily defined as follows:

"940.03 *Third-degree murder.* Whoever in the course of committing or attempting to commit a felony causes the death of another human being as a natural and probable consequence of the commission of or attempt to commit the felony, may be imprisoned not more than 15 years in excess of the maximum provided by law for the felony."

In *State v. Carlson,* 5 Wis.2d 595, 608, 93 N.W.2d 354 (1958), third-degree murder was described as "a combination of a felony or attempted felony, and the fact that in the commission or attempt, a death was caused." If a person causes a death but does not do so while committing or attempting to commit a felony, or if the death is not a natural and probable consequence of the felony or attempted felony, he is not guilty of third-degree murder.

Without evidence of the armed robbery it would be impossible for a jury to determine whether the death

was caused in the commission or attempt of a felony. This was particularly true here because one defense theory was that the shooting occurred after the robbery was completed. If the jury had only been presented with a stipulation stating Daniel Briggs committed an armed robbery at the Wagon Wheel tavern and was then presented with evidence concerning the shooting which took place in the basement of the tavern, it would have had no way of determining whether the shooting occurred in the course of the commission of the armed robbery or whether it was a natural and probable consequence of the robbery.[8] In order to determine whether the death was a natural and probable consequence of the robbery and whether it occurred during the robbery, it was necessary to hear evidence concerning the circumstances of the robbery.

The effect of the stipulation was to reduce the evidence offered by the prosecutor concerning the robbery. This was one goal of the stipulation and it was achieved. The trial court did not abuse its discretion in denying the motion to limit the evidence as to the armed robbery.

The defendant argues that it was error not to submit the requested instruction that he admitted guilt to the armed robbery and that the court would find the defendant guilty based on the admission and plea. The court would not submit such an instruction. We hold that proper. Earlier the court had refused to accept a plea of guilty to armed robbery.

When a death occurs during the course of the commission or attempt of a felony, a defendant can be convicted of third-degree murder if the death was caused by the defendant, or the felony, but not both. When third-degree murder is charged, a separate verdict of the underlying felony can also be submitted to the jury. The

---

[8] *Brook v. State*, 21 Wis.2d 32, 41, 123 N.W.2d 535 (1963).

jury either finds the defendant guilty of third-degree murder, guilty of the underlying felony or not guilty.[9] In this case the trial court was obligated to instruct the jury on this procedure. If it had submitted the requested instruction that the defendant admitted the armed robbery and that the court would find the defendant guilty based on that admission, the jury would have been faced with the paradoxical situation of being told that it was to only arrive at one of three verdicts, but also being told that the trial judge would find the defendant guilty on the armed robbery charge. Because of the confusion which the requested instruction would have created, it was not error nor an abuse of discretion to refuse to give this instruction.

The defense also requested submission of instructions on the lesser included crimes of homicide by reckless conduct and homicide by negligent use of a weapon. The trial court refused to give these instructions and the defendant contends the refusal constitutes reversible error.

The well established standard for submission of lesser-included offense instructions for homicide is that there must be a reasonable ground in the evidence for acquittal on the greater charge and conviction on the lesser.[10] As the court stated in *State v. Bergenthal,* 47 Wis.2d 668, 675, 178 N.W.2d 16 (1970), *cert. denied,* 402 U.S. 972.

"The key word in the rule is 'reasonable.' The rule does not suggest some near automatic inclusion of all lesser but included offenses as additional options to a jury. Only if 'under a different, but reasonable view,' the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime also be submitted to the jury. . . . The purpose of multiple verdicts is to cover

---

[9] *Ronzani v. State,* 24 Wis.2d 512, 519, 129 N.W.2d 143 (1964).
[10] *State v. Anderson,* 51 Wis.2d 557, 560, 187 N.W.2d 335 (1971).

situations where under different, but reasonable, views of the evidence there are grounds either for conviction of the greater or of the lesser offense. The lesser degree verdict is not to be submitted to the jury unless there exists reasonable grounds for conviction of the lesser offense and acquittal on the greater."

Under the circumstances of this case, where the defendant entered the tavern to commit an armed robbery, struck Douglas with the butt of his gun while his father Joseph was being tied up, and became involved in a struggle with Joseph which led to the shooting and death of Joseph, there was no reasonable ground for acquittal on the third-degree murder charge and conviction of the lesser-included crimes.

During the bifurcated portion of the trial concerning whether the defendant suffered from a mental disease or defect to the extent that he could not appreciate the wrongfulness of his conduct, one psychiatrist, Dr. Gehring, testified that the defendant was not legally responsible for his acts on October 4, 1974. In his closing argument the prosecutor stated Dr. Gehring was unqualified to relate his diagnosis to the legal test for mental disease. He acknowledged that Dr. Gehring was a qualified psychiatrist but stated he "lacks the education, training and experience in legal-psychiatric matters." Defense counsel objected to this argument as improper argument. On appeal the defendant contends this argument was prejudicial and constitutes reversible error.

In *State v. Bergenthal, supra* at 681–82, 178 N.W.2d at 24, the court held that a prosecutor had considerable latitude in closing arguments. Reference to the weakness of defense arguments was found to fall well within the outer limits of propriety. The *Bergenthal* court relied on *Berger v. United States,* 295 U.S. 78, 88 (1935), noting that a prosecutor may strike vigorous and hard blows, but not foul ones.

The challenged comments on Dr. Gehring's "education, training and experience in legal-psychiatric matters" were drawn from the evidence presented at trial, including his own admission that he did not know the legal test for mental illness. Prosecutorial comments on the significance of a witness' testimony are entirely proper so long as rooted in the evidence and not mere expressions of personal opinion.[11] The prosecutor argued that the testimony of Drs. Fosdal and Baker was more reliable and should be given greater weight because of their experience in legal psychiatry. This argument was within proper bounds.

The final contention of the defendant is that the trial court abused its discretion in sentencing the defendant to thirty-three years in prison. The defendant was subject to a maximum sentence of forty-five years.[12]

"This court has stated that it will review sentences to determine whether there has been an abuse of discretion. However, such questions will be treated in light of a strong policy against interference with the discretion of the trial court in passing sentence." *Ocanas v. State,* 70 Wis.2d 179, 183, 233 N.W.2d 457 (1975).

The trial court recognized that the sentence imposed was long, and the trial judge stated his belief that the defendant was mentally ill but not to the extent to relieve him of criminal responsibility. He believed the state should have control of the defendant for a considerable period of time. He was not opposed to the parole board "using their good judgment and to releas[ing] the defendant when they think it's right and safe and proper to do so." He made the same observations in reviewing

---

[11] *Bergenthal, supra* at 682, 178 N.W.2d at 24; *Lorenz v. Wolff,* 45 Wis.2d 407, 419, 173 N.W.2d 129 (1970).

[12] *See* secs. 940.03 and 943.32(2), Stats.

his sentence upon the motion for reduction of sentence. Based on the stated reason that the court believed the defendant should be under the control of the state for a lengthy period because of mental instability, and that he did not oppose parole when the defendant was rehabilitated, we do not believe there was an abuse of discretion in sentencing. The defendant had committed a violent crime that resulted in the death of an innocent victim. Judged from the facts as they appear in the record before us, the sentence was not excessive.

*By the Court.*—Judgment and order affirmed.