State of Wisconsin, Plaintiff-Respondent,
v.
Tyson Kreuscher, Defendant-Appellant.
No. 04-0077-CR.
Court of Appeals of Wisconsin.
Opinion Filed: October 12, 2004.
Before Cane, C.J., Hoover, P.J., and Peterson, J.
¶1 CANE, C.J.
Tyson Kreuscher appeals judgments convicting him of two first-degree intentional homicides. The convictions stemmed from the highly publicized deaths of officers Robert Etter and Stephanie Markins, who were both killed in the line of duty after Kreuscher drove his truck into their parked squad car. Kreuscher argues the trial court erred by denying his motions to change venue based on pretrial publicity and his motion for a mistrial after a newspaper reporter violated a court order and published an article containing information about the jurors. Associated with this last argument, Kreuscher also contends the trial court violated his constitutional right to be present by meeting with a juror outside his presence regarding the article's effect on the juror. We affirm the judgments.

BACKGROUND
¶2 On July 22, 2002, Kreuscher drove his truck into a parked police car, killing Etter and Markins. The next day, the State charged Kreuscher with two counts of first-degree intentional homicide. Kreuscher initially pled not guilty by reason of mental disease or defect to both counts.
¶3 Kreuscher filed a motion for change of venue. At a hearing on November 12, 2002, the trial court preliminarily denied the motion. The court indicated that although there was enormous publicity surrounding the case, the publicity's timing was narrowly focused within the period surrounding the alleged offense and subsequent community-grieving period. The court found that by the first part of August the publicity waned. Further, after reviewing what publicity the case had received, the court concluded that it was not "inflammatory or reaching to a level ... of a drumbeat that would persuade me to change venue." Thus, the court determined the publicity did not create a reasonable likelihood that a fair trial could not be had in the county.
¶4 Exercising caution, however, the court stated it wanted to tailor a jury questionnaire, with recommendations from the parties, to measure the publicity's impact on prospective jurors. The court established this filtering process as a beginning point to determine whether a fair jury pool could be convened. The court stated that if the answers to the questionnaire revealed a jury could not be selected to furnish Kreuscher a fair trial, it would reconsider Kreuscher's motion for change of venue on its own and grant the motion.
¶5 After the parties agreed on the questionnaire, it was mailed to 164 prospective jurors who were notified of their coming jury service. Of the 164 responses the court received, the court noted that only eight prospective jurors indicated they had already thought Kreuscher was guilty due to the media or some other reason or expressed some opinion about the event. The court excused those eight people as well as one other person. The court determined a fair and impartial jury could be impaneled from the remaining 155 candidates.
¶6 Prior to jury selection, Kreuscher renewed his motion for change of venue, noting that the case had received additional coverage in the news and other media. The court denied the motion because it again concluded that the media coverage did not rise to a level that would prevent Kreuscher from getting a fair and impartial jury. The court repeated that should it be persuaded that a fair jury could not be impaneled, then it would grant a change of venue on its own motion.
¶7 The jury trial began March 10, 2003. On March 12, the GREEN BAY PRESS-GAZETTE published an article that included personal information about the jurors.[1] The following day the court informed counsel that the jury was "somewhat distressed by the biographical information that was published" in the paper. The court stated it would make inquiries into whether the information affected the jury's ability to be fair and impartial.
¶8 With the consent of both counsel and Kreuscher, the judge met with the jurors outside the presence of counsel. Eleven of the fourteen jurors stated they were contacted by a friend or family member about the article. Most of the jurors stated the article caused them distress. However, all further stated that they could be fair and impartial and would reach a verdict based only on evidence presented at trial.
¶9 The following day, the court told the jury that if any of them wanted to speak to the court individually about any further concerns resulting from the article, they could do so. One juror spoke to the judge in chambers, outside the presence of counsel, but on the record. She inquired why the jury was not informed that there was a reporter in the courtroom during voir dire and that personal information would be printed in the paper. She stated she was upset because the article mentioned personal information about her son. She did not want to be excused, but wanted the court to know she was "very upset." She stated the article would not affect her ability to be fair and impartial, but she merely wanted the court to know how she felt.
¶10 On March 17, Kreuscher moved for a mistrial based on the newspaper article, arguing it prejudicially tainted the jury. The court acknowledged that the article caused the jurors distress, but denied the motion because all jurors stated they could continue to be fair and impartial.
¶11 After the guilt phase, the jury found Kreuscher guilty on both counts. The following day, after the mental-responsibility phase, the jury found Kreuscher had a mental disease at the time he committed the crime but that he did not lack substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law. The court sentenced Kreuscher to life imprisonment on each count, to be served consecutively.

DISCUSSION

I. MOTIONS TO CHANGE VENUE
¶12 Kreuscher argues the trial court erred by denying his motions for change of venue before the trial began because the pretrial publicity created a reasonable likelihood that a fair trial could not be had. See Briggs v. State, 76 Wis. 2d 313, 325, 251 N.W.2d 12 (1977). We disagree.

A. Standard of Review
¶13 A "[c]hange of venue is a constitutional and statutorily guaranteed right where adverse community prejudice will make a fair trial impossible." Tucker v. State, 56 Wis. 2d 728, 733, 202 N.W.2d 897 (1973); see WIS. STAT. § 971.22(1).[2] To establish a presumption of prejudice, a defendant must prove there is a reasonable likelihood a fair trial cannot be held in that county. See Briggs, 76 Wis. 2d at 325.
¶14 The trial court "is on the ground and in a position to sense, in a way that this court cannot, the true sentiment of the community and to judge much more correctly whether it is such as to prevent a fair trial on the part of the defendant[]." Id. at 329 (citations omitted). As a result, whether to grant a defendant's motion for a change of venue rests within the trial court's discretion. See id. at 325. A proper exercise of discretion requires the trial court to review the facts in the record, apply the correct law and, using a rational and demonstrated mental process, arrive at a reasonable result. Hartung v. Hartung, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981).
¶15 However, we must also independently evaluate the evidence and circumstances to determine whether there was a reasonable likelihood of community prejudice prior to and at the time of trial, and whether the jury selection process evidenced any prejudice on the part of the prospective or empanelled jurors. State v. Albrecht, 184 Wis. 2d 287, 306, 516 N.W.2d 776 (Ct. App. 1994). Our independent review is directed by considering the following factors:
The inflammatory nature of the publicity; the degree to which the adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity; the degree of care exercised, and the amount of difficulty encountered, in selecting the jury; the extent to which the jurors were familiar with the publicity; and the defendant's utilization of the challenges, both peremptory and for cause, available to him on voir dire.

Hoppe v. State, 74 Wis. 2d 107, 110, 246 N.W.2d 122 (1976). The State's participation in the adverse publicity is also relevant, id., as is the severity of the offense charged and the nature of the verdict returned, though these last two are the "least compelling factors." State v. Richie, 2000 WI App 136, ¶24, 237 Wis. 2d 664, 614 N.W.2d 837.
¶16 If we conclude the evidence gives rise to a reasonable likelihood that a fair trial could not be had, we must also conclude the trial court erroneously exercised its discretion if it denied the change of venue. See Briggs, 76 Wis. 2d at 325. Any doubts as to whether the evidence gives rise to a reasonable likelihood that a fair trial cannot be had must be resolved in the defendant's favor. Id. We now turn to the media coverage Kreuscher presented to the trial court and independently consider it in light of the above factors.

1. The inflammatory nature of the publicity

a. Pretrial print media coverage
¶17 Kreuscher concedes not only that the print pretrial media coverage was mainly factual in nature, but also that the coverage was not intended to inflame or arouse community feeling against him. Kreuscher nevertheless argues that even straightforward, objective reporting can be inflammatory if it arouses strong emotion. Given the nature of the case, Kreuscher claims "it is certain that anyone aware of the case would have had an emotional reaction to the tragedy, and this emotion would be very difficult to set aside."
¶18 However, as our supreme court recognized in Briggs, "A court looking to the inflammatory nature of the publicity should be primarily concerned with the manner in which the information was presented." Id. at 327. News reports are inflammatory, and thus objectionable, only when they "editorialize, amount to `rabble rousing' or attempt to influence public opinion against a defendant." Id. With this standard, we turn to the coverage contained in the record.
¶19 The bulk of the coverage reflects the community's grieving and condolences, Etter's and Markins' families, friends and acquaintances exalting their lost loved ones, expressions of loss suffered by the greater area's law enforcement community, and memorials in recognition of Etter and Markins. While Etter and Markins are routinely referred to as "heroes," it is evident from the context that this term does not vilify Kreuscher. Thus, remembering Etter and Markins as heroes cannot reasonably be considered editorializing, rabble-rousing or an attempt to influence public opinion against Kreuscher.
¶20 Additionally, scattered throughout all of the articles are witnesses' accounts of the incident coupled with the allegations contained in the criminal complaint. Upon our independent review of the coverage, we are satisfied that the reporting was done in a straightforward, factual manner. Therefore, we agree with the trial court that none of the coverage can be characterized as inflammatory.
¶21 However, Kreuscher objects to the media's repeated use of the words "intentionally," "deliberately," "intentionally rammed," and "intentionally killing" when referring to his actions. He claims it is not only reasonably likely, but extremely likely that this characterization tainted the jury pool by establishing Kreuscher in fact acted intentionally, which was the main issue at trial. But as the State notes, all references to Kreuscher's actions were appropriately modified by "allegedly" or other analogous terms. And we have failed to uncover any instance where an article appears to attest that Kreuscher's act of driving his pickup truck into a parked squad car was in fact done intentionally. While it is possible to isolate passages from news articles to argue to the contrary,[3] when the articles are viewed as a whole, they indicate only that Kreuscher allegedly intentionally killed two police officers.[4] Thus, we conclude the coverage in this regard was also not inflammatory.
¶22 Last, Kreuscher objects to several news headlines referring to him as a "cop killer." First, on Wednesday, July 24, 2002, The Green Bay News-Chronicle reported Kreuscher's initial appearance with the headline, "Cop killer `aimed for' the squad." See Patti Zarling, Cop killer `aimed for' the squad, THE GREEN BAY NEWS-CHRONICLE, July 24, 2002. Second, on Sunday, July 28, 2002, the same paper covered Kreuscher's bail with the headline, "Alleged cop killer's bail increased." See Warren Bluhm, Alleged cop killer's bail increased, THE GREEN BAY NEWS-CHRONICLE, July 28, 2002. Third and finally, just one day before jury selection began, on March 9, 2003, the Green Bay Press-Gazette ran a front-page headline, Andy Nelesen, A glimpse into the mind of an alleged cop killer, GREEN BAY PRESS-GAZETTE, March 9, 2003.
¶23 However, in the last two articles, the writer tempered the phrase by modifying it with "alleged." And though the first article does not contain such limiting language in the headline, after reviewing the article we are convinced the reporting clearly indicates that at that time Kreuscher only faced allegations of causing two police officers' deaths. Thus, here again, we conclude the reporting does not amount to rabble-rousing or attempts to rally public opinion against Kreuscher. Therefore, the reporting when read as a whole was not inflammatory.

b. Pretrial television coverage[5]
¶24 Turning to the nature of the television media coverage, nearly threequarters of it related to honoring Etter and Markins. WBAY Channel 2 broadcasted the two-hour law enforcement motorcade processional from the funeral home to the memorial service as well as the hour-long service. During the televised service, Etter and Markins were remembered as heroes. Much praise was given to them for the people they were and the sacrifices they made. While many tears were shed by loved ones who characterized Etter's and Markins' deaths as senseless tragedies, those tears were matched with thanks given to the community for its outpouring of support. Out of the three-hour broadcast, Kreuscher was briefly mentioned twice, but not by name, by two different onlookers. One onlooker said he had "nothing but anger for the guy that did this" and the other said "if the guy said he had a sickness [referring to reports that Kreuscher suffered severe depression], he shouldn't have been driving, period." Although editorialized, these were nothing more than impromptu, rather limited remarks. This coverage was not inflammatory.
¶25 The news reporting of WBAY Channel 2, WFRV TV 5, and WLUK Fox 11 was also typical, objective reporting. Most of the stories centered on Etter's and Markins' families' and friends' remembrances. Other stories focused on the ripple effect the incident had on the law enforcement community. And except for one isolated instance, all of the coverage involving Kreuscher was properly qualified in terms of what he was alleged to have done. Although some instances described Kreuscher's action as allegedly intentionally or purposefully "ramming" or "smashing" his truck into the squad car, these were other ways of stating what the criminal complaint already alleged: that Kreuscher intentionally drove his vehicle into the squad car. The television media's coverage of this incident does not create a reasonable likelihood that a fair trial could not be had.

2. The degree to which the adverse publicity permeated the area from which the jury panel would be drawn

a. Pretrial print media coverage
¶26 The State conceded at trial that virtually the entire adult public in the area from where the jury panel would be drawn likely would be aware of the case. Kreuscher represented that the Green Bay Press-Gazette had a daily circulation of 58,000 and a weekend circulation of 84,000, but did not provide similar circulation numbers for The Green Bay News-Chronicle.

b. Pretrial television coverage
¶27 Although Kreuscher did not present Nielsen Media Research numbers for WFRV TV 5 or WLUK Fox 11, he did submit a letter from WBAY 2 stating that of the 409,300 households in its viewing area, 23,750 people watched the two-hour motorcade processional and memorial service. Further, on average, 54,000 people watch the 5 p.m. news, 60,000 people watch the 6 p.m. news, and 67,000 people watch the 10 p.m. news.

3. The timing and specificity of the publicity in relation to the time of trial

a. Pretrial print media coverage
¶28 Kreuscher claims the pretrial print media coverage was intensive from the date of the incident through the trial. However, as the trial court observed, the great majority of this coverage contained in the record occurred during the week-and-a-half following the July 22, 2002 crash, or more than seven months before jury selection began on March 10, 2003. Since then, there had been a considerable waning in coverage. We agree with the trial court's assessment.
¶29 By our count, the record contains fifty-six items of pretrial print media coverage, comprised of articles, photo spread exhibits, editorials, obituaries and other miscellaneous items. Of these, forty-five items appeared through the end of July 2002. Predictably, this coverage contained the greatest amount of specificity regarding the incident. Witnesses described what they saw and how they heard Kreuscher admit he did it on purpose, police were often quoted as to what their preliminary investigation had revealed, and the criminal complaint was quoted from, paraphrased or excerpted in several articles. See, e.g., Andy Nelesen and Andy Behrendt, Crash kills 2 officers, GREEN BAY PRESS-GAZETTE, July 23, 2002; Patti Zarling, Driver kills two police officers, THE GREEN BAY NEWS-CHRONICLE, July 23, 2002; Andy Nelesen, Memorial springs up at crash site, GREEN BAY PRESS-GAZETTE, July 24, 2002; Andy Behrendt, Officers' tragedy replays `a lot' in witness's mind, GREEN BAY PRESS-GAZETTE, July 26, 2002.
¶30 The coverage also included remembrances of Etter and Markins. Additionally, many articles reported the details of the motorcade procession and memorial service. See, e.g., Nathan Phelps, Markins was someone always willing to help, GREEN BAY PRESS-GAZETTE, July 24, 2002; Andy Nelesen, Etter was part-time cop, full-time family man, GREEN BAY PRESS-GAZETTE, July 24, 2002; Cynthia Hodnett, Officers touched the lives of many, GREEN BAY PRESS-GAZETTE, July 25, 2002; Memorial service Saturday for two slain officers, THE GREEN BAY NEWS-CHRONICLE, July 25, 2002; Paul Srubas, Citizens welcomed to pay respects to fallen officers, GREEN BAY PRESS-GAZETTE, July 26, 2002; Andy Nelesen, A Final Salute: Family, community mourn, GREEN BAY PRESS-GAZETTE, July 28, 2002; Christopher Clough, They came to honor, remember, THE GREEN BAY NEWS-CHRONICLE, July 28, 2002.
¶31 The following month, August of 2002, contained only seven items of coverage. One story related to a fund-raising effort for a permanent memorial, Leslie Escobar, New drive to pay for officers' memorials, GREEN BAY PRESS-GAZETTE, August 7, 2002, while three articles reported the events of Kreuscher's preliminary hearing and arraignment, Paul Srubas, Hearing set in cops' deaths, GREEN BAY PRESS-GAZETTE, August 8, 2002; Michelle Kennedy, Trial set in two deaths, THE GREEN BAY NEWS-CHRONICLE, August 8, 2002; Tim Harty, Kreuscher enters insanity plea, THE GREEN BAY NEWS-CHRONICLE, August 20, 2002. Two articles were opinion pieces, see Sandy Dean, Coverage of dead officers was excessive, GREEN BAY PRESS-GAZETTE, August 14, 2002; Bob Hurning, Community is thanked for Markins' tribute, GREEN BAY PRESS-GAZETTE, August 15, 2002, and there was a short piece on August 18, 2002, in an article entitled Summer of Violence. Brett W. Meach, Summer of Violence, THE GREEN BAY NEWS-CHRONICLE, August 18, 2002. Following this coverage, there was a fourth-month lull in coverage.
¶32 It was not until December that this case was again in the newspapers, with merely a two-page display dedicating the 2002 "Shop with a Cop!" program to Etter and Markins appearing on December 25 and a December 29 article naming Etter and Markins' deaths the top local news story of the year. See Paul Srubas, Deaths of two Hobart/Lawrence officers tops the year's local news, GREEN BAY PRESS-GAZETTE, December 29, 2002. After this brief coverage, another lull occurred and the case did not receive coverage again until March 2003, when articles appeared on March 7 and 9, the eve of Kreuscher's trial. The March 7 piece reported the judge's refusal to let the prospective jury view the wrecked automobiles, Andy Nelesen, Judge in fatal ramming case won't let jury view wrecked squad car, GREEN BAY PRESS-GAZETTE, March 7, 2003, and the March 9 article was a background story on Kreuscher as told through his family's viewpoint. Andy Nelesen, A glimpse into the mind of an alleged cop killer, GREEN BAY PRESS-GAZETTE, March 9, 2003.
¶33 Thus, this case obtained a seven-month cooling off period. From September 2002 until March 2003, the media blitz had effectively ceased, and that cessation strengthens our agreement with the trial court's conclusion that Kreuscher could, and did, receive an impartial jury and a fair trial. In Hoppe, 74 Wis. 2d at 114, the supreme court held that "even where community prejudice is found to exist initially, a delay or cooling off period contributes to the ability of the state to conduct a fair trial." The court concluded a four-month cooling off period was sufficient to safeguard Hoppe's right to a fair trial. Id. Applying Hoppe to this case, we conclude a seven-month cooling off period was undoubtedly sufficient to preserve Kreuscher's right to a fair trial.

b. Pretrial television coverage
¶34 The broadcasts on the videotapes do not contain airing dates. By our estimation, however, all of the coverage stems from the week after the incident through Kreuscher's preliminary hearing. Also, the specificity of the coverage that we have reviewed mirrored the print pretrial media coverage during that time. Thus, we have the same framework with which to work as above, and, in light of Hoppe, we arrive at the same conclusion here: the approximate seven-month cooling off period preserved Kreuscher's right to a fair trial.

4. The State's participation in the adverse publicity
¶35 Kreuscher does not argue that the State, through the prosecutor's office, directly participated in the adverse publicity,[6] but does claim the police officers investigating the case were frequently quoted regarding Kreuscher's intent; namely, that he hit the squad car intentionally. However, we previously rejected this argument in connection with the first factor, as the officers' statements, in both print and televised mediums, were qualified in terms of allegations.

5. The degree of care exercised, and the amount of difficulty encountered in selecting the jury
¶36 The court was aware of the publicity the case received and was concerned with protecting Kreuscher's right to a fair trial. To this end, the court sent all prospective jurors a specifically tailored questionnaire that gauged their media exposure and its effect. Of the 164 responses, only eight jurors were excused for having an opinion about the incident or Kresucher's guilt.
¶37 The next step in jury selection was general voir dire. Six jurors were removed because they thought Kreuscher was guilty (three before individual voir dire began and three jurors who replaced jurors who were excused following individual voir dire), and ten other jurors were removed for cause unrelated to media exposure. General voir dire also established that only three jurors had not read or heard anything about the case.
¶38 Next, the court conducted individual voir dire. The court took each juror into chambers with the parties to further investigate what pretrial publicity the jurors had been exposed to and how that affected their ability to serve on the jury. Individual voir dire resulted in nine jurors being excused for cause. Four of the excusals had nothing to do with media exposure. In the end, the court denied five defense motions to strike a juror for cause.
¶39 After the stricken jurors were replaced and passed general and individual voir dire, Kreuscher for a third time moved for a change of venue and the court again denied the motion. The court noted that even though all but three of the jurors on the venire were exposed to some pretrial media coverage, all jurors indicated they did not have an opinion about Kreuscher's guilt and would set aside any information they learned from the media and decide the case solely on the evidence and the court's instructions.
¶40 Each side was then given eight peremptory challenges, which resulted in a fourteen-member jury. Of the five defense motions to strike for cause that were denied, all of those jurors were struck with peremptory challenges. In the end, all members of this jury admitted they were exposed to some pretrial media coverage.
¶41 We conclude that the court's painstakingly thorough three-tiered process for selecting a jury reflects the utmost degree of caution and care in selecting a jury. Further, this process yielded little difficulty in empanelling a jury, as only two days of voir dire were required to seat a jury. All the same, in looking at the raw numbers by our count, fifty-five jurors were questioned by the court and parties. Twenty-five jurors were excused for cause, of whom only eleven in some manner indicated that they formed an opinion on Kreuscher's guilt (six during general voir dire, and five during individual voir dire). These numbers do not support Kreuscher's contention that the pretrial media publicity created a reasonable likelihood that a fair trial could not be had. See, e.g., Hoppe, 74 Wis. 2d at 115 (eighteen of fifty-two prospective jurors excused based upon opinions of defendant's guilt was acceptable).

6. The extent to which the jurors were familiar with the publicity
¶42 Although everyone on the jury was exposed to some kind of pretrial media coverage and could generally recall that a man killed two police officers by driving his car into a squad car, all empanelled jurors indicated they did not have an opinion on Kreuscher's guilt, they would be able to set aside any information they previously heard, and, most importantly, they swore to decide the case solely on the evidence and the court's instructions. Our supreme court has held that "[i]t is not required ... that the jurors be totally ignorant of the facts and issues involved." Tucker v. State, 56 Wis. 2d 728, 736, 202 N.W.2d 897 (1973) (citation omitted). While jurors surely must be free of opinion, prejudice, and bias, Hoppe, 74 Wis. 2d at 115, informed jurors need only be able to set aside whatever information they learned and render a verdict based on the evidence. See Irvin v. Dowd, 366 U.S. 717, 723 (1961). Here, the jurors vowed to follow this mandate, and we have no reason to doubt their sincerity.

7. The defendant's utilization of the challenges, both peremptory and for cause, available to him on voir dire
¶43 Individual voir dire resulted in nine jurors being struck for cause: four on Kreuscher's motion because of media exposure; one on a joint motion because of media exposure; one on the State's motion due to the juror's son's mental illness; and three on Kreuscher's motions because one juror was acquainted with Etter's wife, one was the head of the local Crime Stoppers organization and rode in the motorcade processional, and one was guarded in her responses. As noted above, the court denied five of Kreuscher's motions to strike jurors for cause. However, all five of those jurors were later struck with peremptory challenges. Thus, all who were empanelled were jurors Kreuscher could not find reason to move to strike.

8. Severity of the offense charged and the nature of the verdict returned
¶44 As noted above, the severity of the offense charged and the nature of the verdict returned are the "least compelling factors." Richie, 237 Wis. 2d 664, ¶24. Nonetheless, we acknowledge that the State charged Kreuscher with two counts of first-degree intentional homicide, a severe offense, and the jury convicted Kreuscher on both counts.

B. Application and Summary
¶45 We reject Kreuscher's contention that the media coverage created a reasonable likelihood that a fair trial could not be had. Despite the considerable pretrial publicity this case garnered, the coverage was not inflammatory and the seven-month waning in coverage before Kreuscher's trial protected his right to a fair trial.
¶46 We also reject Kreuscher's contention that the jury selection process could not counter whatever emotional impact still lingered within the community as a result of the media coverage. We are satisfied that the court's careful and meticulous three-tiered juror screening process assured that Kreuscher would receive a fair and impartial jury. Further, we see no basis to conclude that the jury selection process evidenced any prejudice on the part of any empanelled jurors. Therefore, upon our independent review, we agree with the trial court's conclusion that there was a reasonable likelihood that a fair trial could be had. Consequently, we conclude the trial court properly exercised its discretion by denying Kreuscher's motions for change of venue.

II. MOTION FOR MISTRIAL
¶47 Kreuscher next claims the trial court erred by denying his motion for a mistrial after the Green Bay Press-Gazette published information about the jurors. He notes that the jurors expressed distress resulting from the newspaper article, while also acknowledging the jurors nevertheless stated they were able to do their duty. However, he maintains that the jurors were subject to public scrutiny and that "these pressures were sufficiently prejudicial to warrant a new trial."
¶48 Our standard of review is explained as follows:
The decision whether to grant a motion for a mistrial lies within the sound discretion of the trial court. The trial court must determine, in light of the whole proceeding, whether the basis for the mistrial request is sufficiently prejudicial to warrant a new trial. We will reverse the trial court's mistrial ruling only on a clear showing of an erroneous exercise of discretion.
State v. Bunch, 191 Wis. 2d 501, 506-07, 529 N.W.2d 923 (Ct. App. 1995) (citations omitted). Here, Kreuscher bases his motion for a new trial on adverse publicity. However, "unless a newspaper article is so prejudicial as to influence the verdict of the jury, it is solely within the judge's discretion as to whether a mistrial is in order." Oseman v. State, 32 Wis. 2d 523, 530, 145 N.W.2d 766 (1966).
¶49 After the article was published, and with the agreement of both parties, the court addressed the jurors about the article in chambers and without counsel present. None of the jurors had read the article themselves, although eleven of the fourteen had been contacted by friends or family who had read the article. Some jurors did express distress regarding the article; nevertheless, all the jurors stated they could remain fair and impartial in deciding the case.
¶50 When the court denied the mistrial motion, it stated, "I was assured by the jurors that they could continue to be fair and impartial in this case. ,,, I'm satisfied that this jury is wholly mindful of their duty and is capable of deciding this case on the evidence and according to my instructions." This determination was not clearly erroneous. Kreuscher argues that the jurors were prejudiced by the article to such an extent that a new trial was necessary. However, there is no indication any of the jurors were sufficiently prejudiced by the article so as to warrant a new trial. Every juror stated that he or she was able to be fair and impartial and to decide the case based on the evidence and the court's instructions. All stated that the article would not distract them from their duty. Therefore, the court properly denied the motion.

III. THE COURT'S MEETING WITH A JUROR
¶51 The day after the court questioned the jury as a whole regarding the newspaper article, it invited individual jurors to address the court on the issue if they wished to do so. One juror did and the meeting took place in chambers outside the presence of counsel and Kreuscher. Kreuscher argues this meeting violated his right to be present.
¶52 A criminal defendant is entitled to be present at his or her trial and to have counsel at every stage where the defendant needs aid in dealing with legal problems. Rogers v. United States, 422 U.S. 35, 38 (1975); State v. Burton, 112 Wis. 2d 560, 565, 334 N.W.2d 263 (1983). For example, a defendant's right to be present is violated when a court has ex parte communications with a deliberating jury without the defendant and the defendant's counsel present, unless the defendant waives that right. Burton, 112 Wis. 2d at 565.
¶53 Similarly, assuming without deciding that Kreuscher had a right to be present during the court's discussion with the juror, we conclude he waived that right. When the court became aware of the newspaper article, it stated it wanted to ensure that the jurors would not be affected by the article and would remain fair and impartial. Therefore, the court suggested that it meet with the jury in chambers to "try to isolate if possible jurors who feel that they have been impacted in a negative way by this article." The attorneys for the State and the defense agreed to this procedure. The court then addressed Kreuscher: "[Y]ou have listened to the process that we propose to follow here with regard to guaranteeing that you have a fair and impartial jury. Are you satisfied with this process as well?" Kreuscher responded, "Yeah." Kreuscher does not dispute that he waived his right to be present when the court talked to the jury about the article.
¶54 As we have noted, at the meeting with the court, all jurors stated that the article did not affect their ability to remain fair and impartial. All stated they would base their decision only on evidence presented during the trial and the court's instructions. Therefore, the trial continued. The following day, the State rested its case. At this time, the court again addressed the issue of the newspaper article and the conference the court had with the jury the day before. The court told the jury in open court,
Now, if there are any of you who individually wish to have contact with me by way of a question that you might have, a continued question you might have or any issue that you wish to address me as a result of that conference, then I invite you now also to let the bailiff know that fact so we could take care of that this morning ....
After the jury left the courtroom, the court addressed the parties: "All right. I'm going to ask the lawyers to try to stay close. I'm assuming this will only take hopefully, you know, ten or fifteen minutes, and then we can discharge the jury, okay?"[7] Kreuscher's attorney responded, "Thank you."
¶55 Kreuscher had already consented to the court talking to the jury about the newspaper article and its possible effect on the jury. The court's discussion the next day with an individual juror was merely an extension of that process. We therefore conclude that Kreuscher's waiver of his right to be present when the court met with the entire jury also applied to the court's meeting with the juror.
¶56 However, even if Kreuscher's waiver did not carry over from the previous day, he did not object to the court's invitation to the jurors to meet with it individually. In fact, Kreuscher's attorney responded, "Thank you," after the court stated its intentions and asked the attorneys to "stay close." Had there been any objection to the court talking to individual witnesses outside the presence of counsel, Kreuscher's attorney had the opportunity to make the objection at that time. However, he did not. Therefore, Kreuscher failed to preserve any right to be present.
By the Court.  Judgments affirmed.
NOTES
[1] The jurors were not identified by name, but by age or occupation such as: "A man in his 30s," "A retired college professor," and "A soft-spoken director of nursing at an area nursing home." The article also mentioned whether the jurors made any comments during voir dire regarding their familiarity with the case, and regarding four jurors noted that the juror or a family member had taken medication for mental illness.
[2] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[3] See, e.g., Patti Zarling, Driver kills two police officers, THE GREEN BAY NEWS-CHRONICLE, July 23, 2002 (quoting a Brown County sheriff's department captain as stating "This was ... a deliberate act by someone who carried out his mission to slay two police officers."); Paul Srubas, Officers feel emotional toll of deaths, GREEN BAY PRESS-GAZETTE, July 26, 2002 (quoting one source as stating: "`When I heard it happened, it was bad enough,' ... `[b]ut when I heard it was intentional, it just made it that much harder to swallow.").
[4] Kreuscher asserts that inserting "alleged" in front of these terms does not change the overall meaning. He claims that this qualifier is so common that it has become filler language with no real meaning to anyone. However, an allegation is nothing more than an assertion without proof. Further, if Kreuscher's contention was true, then all defendants who are alleged to have intentionally done something and who receive attention in the media would ultimately be convicted. That is not the case.
[5] As the State notes, Kreuscher has limited the scope of his argument to print media coverage. We have reviewed and will discuss the television coverage, however, pursuant to our duty to independently review the evidence and circumstances.
[6] After reviewing the record, we could not locate any instance where the State uttered inflammatory remarks or any comments that would contribute to a reasonable likelihood that a fair trial could not be had.
[7] The State rested its case on a Friday and the defense was not to begin until Monday. The court was concerned with releasing the jury early on a Friday and risking added exposure to the case. Therefore, in addition to being given the opportunity to address the court regarding the article, it was also to discuss among themselves whether they wanted to be sequestered for the remainder of the trial, sequestered for the weekend, sequestered for the remainder of the day on Friday, or whether it wanted to be released.